## LANG v. STATE

No. 40098 May 14, 1956 87 So. 2d 265

148

*Jeff Collins, Luther Austin, Ronald C. Brown,* Laurel, for appellant.

*J. R. Griffin, Asst. Atty. Gen.,* Jackson, for appellee.

Brief for appellant.

Brief for appellee.

Lee, J.

Theldor Lang, a Negro man, was convicted of the forcible rape of a white woman, and was sentenced to life imprisonment in the state penitentiary. From the judgment entered, he appealed.

Mrs. Edna Earle Dreding, twenty years of age, was living with her year old baby girl in a duplex apartment in the City of Laurel. Her husband was a sailor in the United States Navy, stationed in the City of Boston. According to her evidence, on the evening of August 4, 1954, she and her daughter went to a picture show, returning home about 11:45 o'clock. The door was locked as she entered the house, and the baby was placed in her crib at the foot of the bed. She then undressed and retired. About thirty minutes later, she was awakened by someone touching her on the leg. Before her stood a man with a flashlight in one hand and a pistol in the other. On asking what he wanted, his answer—vulgar and unprintable slang, sometimes seen on the walls of unkept public urinals and toilets—demanded sexual intercourse with her. She asked him to leave, promising that she would say nothing about his being in the house, if he would do so. But he informed her that, if she did not do as he wanted, he would hurt her baby; and that his buddy

had the baby in another room. He then flashed the light into the crib, and she saw that the baby was gone. Immediately she asked him to bring her baby back. He then took a step or two as if to go, but stopped and said, "That's your choice." Then out of fear both for herself and the baby, she consented to his demands on his promise that he would not hurt her. He told her to take her pants off; and when she did so, he got on top of her. He was holding the gun to her head with his right hand, and put the light down for a minute. After "he got through", he got up, stood there a minute, and told her not to make any sound. When she asked him to bring her baby back, he went through the living room, got the baby, and put her in the bed. As he walked through the door between the bedroom and living room, he stopped, flashed the light into her eyes, and told her not to move or get up or try to get help because he or his buddy would be watching her. She estimated that the man was in the house from thirty to forty-five minutes. After he left, she sat on the bed for about thirty minutes and then got up and closed the door, observing at the time that a screen was off the window in the living room. At that juncture, she went to the bathroom and took a douche with usual syringe, and lysol as medication. Afterwards she put on a pair of blue jeans and sat in the doorway of the room, giving as her reason that she was afraid because her assailant said that he would kill her or the baby, if she made an outcry. She explained that the doors into the other apartment were locked, and the knobs had been taken off; and her telephone was on the couch, near the living room window. Because of fear, she refrained from the use of the telephone or an attempt to attract the attention of the family in the other apartment. When daylight came, she took the baby and went in her car across town to the home of a brother, Petro Williams, where she made complaint as to what had occurred. She was asked why she let her assailant

have intercourse with her, and she replied that she was afraid that he would hurt the baby.

Mrs. Dreding testified that the night was neither dark nor light; that a street light was only about one and a half blocks away; that she opened the window blinds after she went to bed, in order to let the breeze in; and that she was able to see her assailant. She got a good view of his profile. He was a light colored Negro man, about 5 feet 2 to 6 inches tall, weighing 130 to 135 pounds, with hair receding from his forehead, and a sort of slump in his walk. Besides he had an educated voice and a sweet strong odor as if cologne or toilet soap or something of that kind was on him. She did not see this man again until the following July near the post office, and later at the police station, when she was able to identify him by his walk, talk, features, and looking at him.

Mr. and Mrs. Petro Williams testified that when the prosecutrix got to their home about daybreak, she was extremely upset, crying, and trying to tell them what had happened to her, and that she did tell them that she had been raped. Her complaint was also made to several officers, who were speedily summoned, and they likewise observed her nervous and upset condition. The chief of police went to the apartment where he found that a screen had been removed from the window, and a water bag and douche nozzle were lying in the bathtub. Mrs. Dreding's billfold was found under a truck near the Masonite plant.

A police officer stated that he lifted fingerprints from the window, but all of them were unsatisfactory except about one. It developed that the defendant, along with several others, was picked up the next day and was fingerprinted; but after a comparison of his prints with the ones which had been taken from the window, he was released without being submitted to the prosecutrix for identification.

The defendant testified for himself, and denied any knowledge of the crime. He claimed that he worked that

night on the 11:00 p. m. to 7:00 a. m. shift at the Mengel plant, which was about two blocks from the Masonite plant. It developed that he is a college graduate, and had taught school for several years. He had worked at the Laurel General Hospital from August 15, 1952 until July 3, 1953. He denied that he used perfume on his body about the time of this alleged offense, or at any time prior thereto; but admitted that, after he began working for Office Supply Company, several months later, he did use it to keep the odor down. The work records of Mengel were offered in evidence to show that the defendant worked that night on this particular shift; but the custodian thereof had no personal knowledge as to whether the defendant actually worked during those hours. He stated that sometimes an employee would exchange shifts with another. The foreman of the shift had no personal recollection as to whether the defendant worked on that particular night shift.

In rebuttal, L. O. Ritchie testified that the defendant worked under him at Laurel General Hospital for the period mentioned above; and that during that time, the defendant habitually had a sweet smelling, sickening odor of perfume about him all of the time. C. E. Pulliam testified that he worked on the 11:00 p. m. to 7:00 a. m. shift that night, and that the defendant did not work on that shift, but on the previous one, that is, from 3:00 to 11:00 p. m. Glenn Holifield, a deputy sheriff, testified that the defendant, in a conversation after his arrest, said that he did not remember which shift he worked on that night.

In surrebuttal, the defendant denied that he worked from 3:00 to 11:00 p. m.

The appellant contends that he was entitled to a peremptory instruction because, he says, the State did not prove that the prosecutrix was raped, or that her private parts were penetrated.

The indictment is based on Section 2358, Code of 1942. ■ ■ A necessary element of the crime of rape is that some penetration of the female's private parts by the sexual organ of the assailant must occur. This is true in every case except where the female is under twelve years of age, and even then it must be shown that her private parts have been lacerated or torn in the attempt to have carnal knowledge of her. See also 75 C. J. S., Rape, Sec. 10b, p. 472; 44 Am. Jur., Rape, Sec. 3, pp. 902-3.

It would have been such a simple matter to have inquired of the prosecutirx whether or not the sexual organ of the accused penetrated her private parts. She graphically described practically everything else in connection with her experience. Undoubtedly she could have testified fully as to this material element if she had been asked, or if she had had presence of mind to do so on her own accord. ■ ■ The direct evidence of the prosecutrix, in this kind of case, ought always to be adduced, if possible. She was not asked this direct question, nor did she unequivocally testify to this fact in simple language. However, the object of his presence in her house, expressed in crude, vulgar, and unprintable language, unmistakably signified sexual intercourse. She was in bed, sparsely dressed, and he required her to take off her pants. Then he got on top of her. After he got through, he stood up a minute. Afterward she went to the bathroom and took a douche, using lysol as a disinfectant. Answering why she let the defendant have *intercourse* with her, she replied that she was afraid that he would hurt her baby.

■ ■ "It is not indispensable that the penetration be proved by the testimony of the prosecutrix; it may be established by circumstantial evidence." 44 Am. Jur., Rape, Sec. 100, p. 965. Also "In order to sustain a conviction of rape the fact of penetration must be established beyond a reasonable doubt, but it need not be

proved in any particular form of words, and circumstantial evidence may suffice.'' 75 C. J. S., Rape, Sec. 71, p. 547. ██ Thus the proof on penetration was sufficient to take that issue to the jury, and the requested peremptory was properly overruled.

Under the proof as to the identity of the assailant, the remarks of the district attorney, in his closing argument, objected to by the defendant, were justifiable comment and were not objectionable.

██ A State instruction, complained of, should have referred to Mrs. Dreding either by her name or as prosecutrix rather than as ''the injured party.'' But in view of all the other instructions in the case, this dereliction could have caused no harm.

The other State instruction, which is complained of, sufficiently complied with the principles announced in Rodgers v. State, 204 Miss. 891, 36 So. 2d 155, and McGee v. State, 40 So. 2d 160 (Miss.). See also Alexander's Miss. Jury Instructions. Sec. 4054, p. 278.

██ Appellant also complains at the introduction by the State of evidence that the prosecutrix was nervous, crying and upset about four hours after the commission of the offense, when she reached the home of her brother and was there observed by his family and the officers. This evidence was properly admitted. 75 C. J. S., Rape, Sec. 57b, p. 530.

██ Since there was some similarity between the distinct odor of the assailant on this occasion and the distinct odor which attached to the defendant on previous occasions, and his admission of the subsequent use of perfume, the evidence of the witness Ritchie was entitled to go to the jury on the question of identification for whatever it was worth; and its admission did not constitute error. Cf. Shaw v. State, 136 Miss. 1, 100 So. 519.

██ The fact that the defendant and his wife were separated at the time of this offense did not tend to

solve any issue in this case; and it was improper for the State, on cross-examination and over the objection of the defendant, to elicit that information from him. However this impropriety was insufficient to work prejudice against him.

■ ■ The failure of the defendant's fingerprints to conform to those prints which were taken from the window did not necessarily create a reasonable doubt as to his guilt. The assailant had represented to his victim that he had a "buddy" with him. It is not unreasonable that the original motive was burglary or rape, or both, in which he actually had an accomplice. Mrs. Dreding's billfold was taken from the house, and was later found under a truck near the Masonite plant. The prints, which were lifted from the window, could be those of such accomplice, in which event they obviously would not have matched those of the defendant. It is also not unreasonable that the accomplice, if there was one, effected an entrance into the apartment through the window, and then let the assailant in through the door. In that event, of course, no prints of the assailant would have been left on the window. It is apparent that the jury was well warranted in finding that the fingerprint evidence was of no actual value whatever.

■ ■ Likewise, when the evidence to establish his alibi is thoroughly sifted and analyzed, it is clear that the jury was also warranted in finding that it had vanished and possessed no evidential value.

Mrs. Dreding was positive in her identification of the defendant. This, together with the other facts and circumstances, presented for the jury an issue as to his identity and guilt; and we are unable to say that the verdict of the jury was contrary to the overwhelming weight of the evidence.

No reversible error appears in the record, and the cause must, therefore, be affirmed.

Affirmed.

*Roberds, P. J.,* and *Arrington, Ethridge,* and *Gilles-pie, JJ.,* concur.

## MOTION FOR TRANSFER OF APPELLANT FROM STATE PENITENTIARY TO THE JONES COUNTY JAIL.

The conviction by the Circuit Court of Jones County of Theldor Lang for the crime of rape, and his sentence to life imprisonment in the state penitentiary was affirmed by this Court on May 14, 1956. His suggestion of error was overruled on June 28, 1956; and the mandate of this Court was sent down to the clerk of the circuit court on June 29, 1956.

On July 13, 1956, Lang prayed for and obtained an appeal to the Supreme Court of the United States, with a stay of execution of sentence pending the appeal, and the mandate of this Court was recalled. The appeal was perfected, and the record has been filed in the Supreme Court of the United States.

But, in the meantime, in fact on July 13, 1956, the same day that the appeal was granted, the penitentiary authorities took Lang in charge and incarcerated him in the penitentiary, where he is now executing his sentence.

Movant Lang prays for his return from the penitentiary to the county jail of Jones County to await the result of his appeal to the Supreme Court of the United States, contending that pending such appeal, he is entitled to be near his counsel and friends, and that punishment cannot be inflicted upon him until or unless his appeal to the Supreme Court of the United States shall come to naught.

Section 2540, Code of 1942, provides as follows: *"Sentence upon conviction—in cases not capital, convict committed until fine and costs paid.*—In cases not capital the court shall order the convict to stand committed until the fine, costs, and jail fees be paid."

162

Section 2544 thereof provides as follows: "*What done with convict pending appeal.* —If the defendant appeal from the conviction and be not removed on appeal, as provided in the next succeeding section, he shall be detained, according to the judgment of the circuit court, until the Supreme Court shall have decided his case, and the judgment thereof shall have been certified to the circuit court and the same fully executed." The next succeeding Section 2545 authorizes the judge of the court where the prisoner was tried, or a judge of the Supreme Court to order his delivery to the sheriff of Hinds County, where the Supreme Court is held. No order of this kind was made. The above Section 2544 deals with cases not capital. A different law applies in capital cases. See Section 2551, Code of 1942 Anno., which provides in part as follows: "Any person convicted of a capital offense wherein the death sentence has been imposed shall be immediately transmitted to the maximum security cell block at the state penitentiary; and, upon final affirmance of his conviction, the punishment shall be there imposed in the lethal gas chamber."

▆▆▆ The appeal to the Supreme Court of the United States has effectually stayed the execution of Lang's sentence. Pending the disposition of that appeal, punishment of the prisoner cannot be exacted. On the contrary he must be returned by the penitentiary authorities for incarceration in the county jail of Jones County, in the county where he was convicted and sentenced, subject, of course, to the power of the judge of the circuit court of Jones County to order his removal to some other jail for safekeeping.

Motion sustained and prisoner's return from the state penitentiary to Jones County jail ordered.

*Roberds, P. J.,* and *Hall, Holmes* and *Ethridge,* JJ., concur.

## ON MOTION OF APPELLANT FOR LEAVE TO FILE MOTION FOR NEW TRIAL IN TRIAL COURT

GILLESPIE, J.

The petitioner, Theldor Lang, was convicted of rape and sentenced to life imprisonment in the State penitentiary by the Circuit Court of the Second Judicial District of Jones County at the regular September 1955 term of that court. Lang appealed to this Court and his conviction was affirmed on May 14, 1956, as reported in 87 So. 2d 265, which case bears the same number as this petition. Suggestion of error was overruled by this Court on June 28, 1956. Thereafter Lang filed in the Supreme Court of the United States a petition for writ of certiorari, which was denied on December 3, 1956. Petitioner has now filed in this Court what he calls a "motion for leave to file a motion for a new trial in the trial court, in the nature of a petition for a writ of error coram nobis."

After setting forth the facts of his conviction and affirmance as herein stated, the petition alleges that at his trial in the circuit court Mrs. Edna Dreding testified that she was raped by a negro in her apartment in Laurel, Mississippi, during the night of August 5, 1954; that she was awakened by an intruder who held a flashlight in her eyes and she was told not to make any noise; that the intruder told her that if she would submit to his demands, he would not hurt her baby, and that his "buddy" had her baby in another room; that she looked and her baby was not in the room with her where it was supposed to be; that the intruder raped her; that the intruder then went into her living room and brought her baby back to her bed; that he then left through her front door; that her assailant was a light colored negro, about five feet two or three inches tall, not more than five feet six inches, and weighed between 130 and 135 pounds. The petition further alleges that in the trial in the court be-

low, the testimony of officer of the Laurel Police Department and the Jones County Sheriff's Office revealed that a screen window was removed from the living room of Mrs. Dreding's apartment and finger prints were found on the window ledge; that Mrs. Dreding's billfold was later found near the Masonite Corporation in Laurel; that in the trial below petitioner testified he was five feet ten inches tall and weighed 140 pounds, and that he was at work at the Mengel Company on the night when the crime was alleged to have been committed; that his payroll and time clock records were introduced to prove that he was at work on that night and received pay therefor.

The petition further alleges that a Mrs. Helen Sims was raped by a negro in her apartment in Laurel, Mississippi during the night of June 15, 1956; that Mrs. Sims was awakened by an intruder who held a flashlight in her eyes and she was told not to make any noise and was also told that if she made an outcry he would kill her and her baby; that the intruder told Mrs. Sims that he had moved her baby into another room; that the baby was not in the room with Mrs. Sims where it was supposed to be; that the intruder then raped her after which he left by way of the back door to her apartment; that Mrs. Sims' assailant was a negro who was shorter than she, and Mrs. Sims is five feet seven and one-half inches tall; that a screen window was removed from one of the windows in Mrs. Sims' apartment. The petition further alleges that one Leroy Moody, a negro man 26 years old, five feet three inches tall, weighing 130 pounds, was arrested and thereafter confessed to the raping of Mrs. Helen Sims; that he was thereafter indicted for the crime, pleaded guilty, sentenced to life imprisonment by the Circuit Court of the Second Judicial District of Jones County, Mississippi.

The petition further alleges that the fingerprints found on the window ledge in the apartment of Mrs.

Edna Dreding, after she complained of being raped on August 5, 1954, were, after the apprehension of Leroy Moody, identified by experts as being the fingerprints of the said Leroy Moody.

It is further alleged in the petition that at the time of the rape of Mrs. Edna Dreding on August 5, 1954, Leroy Moody was employed at a service station directly across the street from the Masonite Corporation in Laurel, Mississippi; that Mrs. Dreding's billfold, which was taken from her apartment on the night she was raped on August 5, 1954, was found at a point fifty or sixty feet from the service station at which the said Leroy Moody was employed; that said billfold, when taken from Mrs. Dreding's apartment, contained her wedding ring, which wedding ring was on November 5, 1956 found in the possession of Ernestine Moody, the wife of Leroy Moody, and the ring was identified by Mrs. Dreding; that Ernestine Moody made conflicting statements regarding her possession of the ring, saying that (1) she bought the ring and that Leroy Moody did not know anything about it; (2) that her grandfather in St. Louis had given her the ring, and (3) that Leroy Moody had given her the ring on or about August 27, 1954; that Leroy Moody stated to the officers that he had obtained the ring from a man he did not know while working at the service station across from the Masonite Corporation.

It is stated in the petition that the facts hereinabove stated were not known to the petitioner and his attorneys until during the month of December 1956, and could not possibly have been known to petitioner or his attorneys at the time of the trial by the exercise of due diligence; that the facts are material to the issues in petitioner's case and tend to establish the guilt of Leroy Moody to the crime for which petitioner was tried and convicted, and when these facts were considered with the rest of the testimony in petitioner's case tend to leave a very serious doubt as to petitioner's guilt, and would

probably change the result if a new trial was granted, and that such facts are not merely cumulative, nor do they tend to impeach the testimony of any witness who testified at petitioner's trial.

Petitioner then prays that he be granted leave to file a motion for a new trial in the trial court on the ground of newly discovered evidence set forth in summary form hereinabove.

Attached to the petition is the affidavit of Theldor Lang and of the attorneys for Theldor Lang, in which oath is made that they believe the facts set forth in the petition are true and that such matters and facts were not known to petitioner or the attorneys at the time petitioner was tried in the Circuit Court of the Second Judicial District of Jones County, and could not possibly have been known to petitioner or said attorneys by the exercise of due diligence. Also attached to the petition is the affidavit of C. Wayne Valentine, Chief of Police of the City of Laurel, Mississippi, who investigated the complaint of Mrs. Edna Dreding at the time she complained of being raped on August 5, 1954, and also investigated the complaint of Mrs. Helen Sims that she was raped during the night of June 15, 1956. The substance of Chief Valentine's affidavit is set out in the petition. Chief Valentine was available in this Court when this petition was presented, ready to testify to the truthfulness of the petition. Inasmuch as no issue was made as to the truthfulness of the petition, this Court did not request any oral testimony.

The State filed an answer admitting, in substance, the allegations of the petition but says that the effect of the newly discovered evidence would amount to no more than additional evidence on the issues thoroughly litigated in the trial court, and moved the court to deny the petition.

It will be observed that the relief sought by this petition is based on newly discovered evidence. If we

treat the petition as one for the writ of error coram nobis, we would be required to deny the petition. It has been repeatedly held that the writ of error coram nobis can not be invoked for newly discovered evidence going to the merits of the issues tried in the court below. Wetzell v. State. 76 So. 2d 194; 24 C. J. S., Criminal Law, Sec. 1606, pp. 149-150; 49 C. J. S., Judgments, Sec. 312, pp. 567-568; 31 Am. Jur., Judgments, Sec. 804; Annotation, 1924, 33 A. L. R. 84; Fugate v. State, 85 Miss. 94, 37 So. 554; Cummins v. State, 144 Miss. 634, 110 So. 206; White v. State, 159 Miss. 207, 131 So. 96; Powers v. State, 168 Miss. 541, 151 So. 730; Buckler v. State, 173 Miss. 350, 161 So. 683; Roberson v. Quave, 211 Miss. 398, 51 So. 2d 62, 777; Wheeler v. State, 70 So. 2d 82.

We need not discuss further the writ of error coram nobis except to say that if a simple motion or petition, a procedure that could easily be under stood by the bench and bar, had displaced the writ years ago it would have saved considerable confusion and better served the administration of justice.

Petitioner brought this proceeding under Chapter 250, Mississippi Laws of 1952, which provides:

"Section 1. Except as hereinafter otherwise provided, the writ of error coram nobis, and the procedure therefor, as heretofore defined by the decisions of the supreme court of this state, is hereby recognized by statute.

"Section 2. In all cases wherein a judgment of conviction in a criminal prosecution has been affirmed on appeal by the supreme court, no petition for the writ of error coram nobis shall be allowed to be filed or entertained in the trial court unless and until the petition for the writ shall have first been presented to a quorum of the justices of the supreme court, convened for said purpose either in term time or in vacation, and an order granted allowed the filing of such petition in the trial court.

"Section 3. No application for leave to file a petition for the writ shall be heard or considered by the court except on three days written notice thereof personally served on the attorney general or one of his assistants, provided, however, the three day rule may be waived for grounds sufficiently urgent and necessary to due process as to cause any justice to order the same, and provided further that in all cases the attorney general shall have actual, advance notice, where possible to give the same.

"Section 4. Upon consideration of the application for leave to file the petition for the writ, the justices before whom the matter is pending may require the applicant or the state to submit oral testimony, subject to cross examination, to support the allegations of the application or the petition or any answer thereto, and a failure to comply with such order shall be sufficient ground for the denial of the application.

"Section 5. Upon order and mandate granting leave to file the petition, the trial court with all reasonable dispatch, on a day to be fixed by its order, shall proceed to the hearing of the petition. The trial court may require the parties to adduce evidence in support of their contentions, including oral proof if considered necessary, and the failure by the petitioner to adduce oral proof, when the same has been ordered, shall be sufficient ground for the dismissal of the petition.

"Section 6. Either the state or the petitioner may appeal to the supreme court from an order of the trial court granting or denying the writ, but written notice of such appeal shall be filed with the clerk of the trial court not later than two full calendar days after the day and date of the order desired to be appealed from. This requirement shall be jurisdictional on appeal.

"Section 7. Upon appeal, the record and the transcript of the testimony shall be made up with all reasonable dispatch and filed in the supreme court, after which

the court, on a day not more than ten (10) days thereafter, to be fixed by order of the Chief Justice, shall proceed to hear and determine the appeal, whether or not the court be in formal recess at the time.

"Section 8. If the petitioner or petitioners be under sentence of death and the day fixed for the execution of the sentence shall arrive at a time when proceedings for the writ are on file and pending adjudication, then the execution of the sentence shall be automatically stayed and the tribunal then having jurisdiction of the matter shall so notify the sheriff of the county of conviction, and the superintendent of the state penitentiary. If, however, there shall have been such an automatic stay of execution and the application or writ shall be denied, then the tribunal having jurisdiction of such application or petition shall forthwith fix a day, not more than twenty-one (21) days distant, for the execution of the sentence, and mandate or warrant shall forthwith issue accordingly.

"Section 9. The decision of all grounds litigated, in an application for leave to file, or upon the petition itself where leave is granted, shall be res adjudicata of such grounds raised in any subsequent application or petition."

At the time of the adoption of Chapter 250, Laws of 1952, the writ of error coram nobis was in use in this state but there was no other clearly recognized procedure available to vacate a judgment and obtain a new trial in a case wherein judgment of conviction in a criminal prosecution had been affirmed by this Court on appeal. It was the intention of the legislature in enacting this legislation to provide that no petition the purpose of which was to vacate a judgment of conviction in a criminal proceeding that has been affirmed by this Court on appeal could be entertained in the trial court unless and until the petition shall have first been presented to a quorum of the justices of this Court convened for that purpose in term time or vacation, and an order

granted allowing the filing of such petition in the trial court. We have said that the writ of error coram nobis, as such, can not be invoked in the present proceeding, but this Court has the plain duty to invoke its inherent powers and declare in simple and understandable terms just what procedure is available when a situation develops demanding that a judicial inquiry be made to determine whether a judgment should be vacated and a new trial granted. Because of the legislative intention in enacting Chapter 250 of the Laws of 1952, any remedy other than error coram nobis that might result in the vacation of a judgment of conviction in a criminal case which has been affirmed by this Court on appeal should be governed, as to procedure, by that statute.

 When the facts set out in the petition are considered together with the facts revealed by the transcript of the testimony in petitioner's trial, such grave doubt arises as to petitioner's guilt that no enlightened court dedicated to the plainest principles of justice should deny a judicial inquiry to determine whether the judgment should be vacated and a new trial granted. If there is no parallel case in the books, and if it can be said that there is no clear precedent for the entertainment of this petition, such should not deter us from the performance of our duty.

 We find no occasion at this time to adopt the simple motion or petition in place of the writ of error coram nobis in cases where that ancient writ is properly invoked. What we are doing is to say that where the writ of error coram nobis does not lie, and a petition is filed under Chapter 250, Laws of 1952, bringing a case within the narrow limits stated in the following paragraph, we will entertain such petition as being a remedy supplemental to the writ of error coram nobis. And in so doing we are not without any guide from our former decisions. In Miss. & Tenn. RR. Co. v. Wynne, 42 Miss.

315, the simple and convenient motion was approved, and the contention that the only remedy was the writ of error coram nobis was rejected although it was a typical case for the application of that writ. As late as 1910 we recognized that coram nobis was obsolete and was superseded by the more speedy remedy by motion. Corry v. Buddendorff, 98 Miss. 98, 54 So. 84. In Carraway v. State, 163 Miss. 639, 141 So. 342, we said that the relief, for the granting of which the writ of error coram nobis lies, can be granted on a motion or petition. In a case holding that a justice of the peace court was without power to vacate a judgment rendered at a former term on petition therefor, this Court, in Lott v. Illinois Central Railroad Co., 193 Miss. 443, 10 So. 2d 96, observed that the relief which once could only be granted on the archaic writ of error coram nobis can now be granted in response to a simple motion or petition. In Buckler v. State, 173 Miss. 350, 161 So. 683, and in Mitchell v. State, 179 Miss. 814, 176 So. 743, the late Chief Justice Smith wrote separate opinions, dissenting in part in the former, and in both called to the attention of the bar that the writ of error coram nobis was obsolete and that a simple motion was the proper procedure when a judgment was sought to be vacated, and in so doing in the latter case said: "No writ of error coram nobis is necessary, as this Court has more than once said; and if members of the bar . . . . would only remember and act on this, much trouble would be saved them and this Court." It will thus be seen that the Court has already fully recognized the inherent power of the court to entertain a motion or petition to vacate a final judgment in a proper case, although for some reason such procedure has not found acceptance in practice, at least in recent years.

We entertain and sustain the petition under Chapter 250, Laws of 1952, as being a petition for leave to file in the trial court a motion to vacate the judgment

and for a new trial on the ground of newly discovered evidence, and such leave is hereby granted. We recognize that there must be an end to litigation, and a judgment once solemnly entered must not be lightly opened or vacated, and never except for cogent reasons. ▮ ▮ Such a petition should be confined to the narrowest limits compatible with justice; it will be sustained only if the newly discovered evidence is of such nature that it would be practically conclusive that it would cause a different result; it will not be sustained if the petitioner or his attorney knew of the existence of such evidence at the time of the trial, or could have discovered it by the exercise of due diligence; it will not be sustained if the newly discovered evidence is merely cumulative, or additional to that adduced at the trial; it will not be sustained if the newly discovered evidence merely tends to impeach other testimony offered at the trial; and it must be filed as soon as reasonably practical after the discovery of the new evidence.

Leave is therefore granted to the petitioner to file in the trial court a motion for a new trial based on newly discovered evidence. The trial court should hear the proof offered by the parties and, in the exercise of his sound discretion, determine whether a new trial should be granted.

Petition for leave to file a motion for new trial in the trial court granted.

All Justices concur, except *Holmes, J.*, who dissents.

HOLMES, J. dissenting.

I regret that I am constrained to dissent from the majority opinion. With deference, I feel that the exigencies of this case have influenced the majority to disregard jurisdictional limitations and to open an avenue which may lead to the serious impairment of the finality of solemn judgments.

The petitioner has filed in this Court what he denominates as "a motion for leave to file a motion for a new trial in the trial court, in the nature of a petition for writ of error coram nobis." The relief sought by the motion or petition is based upon newly discovered evidence. The majority opinion says: "We entertain and sustain the petition under Chapter 250, Laws of 1952, as being a petition for leave to file in the trial court a motion to vacate the judgment and for a new trial on the ground of newly discovered evidence, and such leave is hereby granted."

It is conceded by the majority that if the petition be treated as one for a writ of error coram nobis it would be necessary to deny it because this Court has repeatedly held that the writ of error coram nobis will not lie for newly discovered evidence. They then say, however, that they entertain the petition under Chapter 250, Laws of 1952, as being a petition for leave to file in the trial court a motion to vacate the judgment and for a new trial on the ground of newly discovered evidence. Chapter 250, Laws of 1952, deals solely with the writ of error coram nobis and the procedure therefor. It makes no provision for procedure where the relief is sought by motion or petition. Notwithstanding, the majority have adopted as applicable to a proceeding by motion or petition the same procedure made applicable where relief is sought by writ of error coram nobis. It is granted that under the decisions of this Court the relief for which the writ of error coram nobis lies can be granted on a motion or petition. This, however, is a matter of procedure. This Court has never held that the grounds for relief are broader or different where relief is sought by motion or petition than where relief is sought by writ of error coram nobis, and there is no logical reason why the grounds for relief should be broader or different in the one case than in the other. Yet the majority, while conceding that the relief by writ of error coram nobis can

not be granted on the ground of newly discovered evidence, hold that relief upon such ground may be granted where the procedure is by motion or petition. I am unable to perceive why the ground for relief should be different in the one case than in the other. This Court has definitely committed itself to the proposition that relief by writ of error coram nobis cannot be granted on the ground of newly discovered evidence. With deference, I can see no justification for broadening the ground so as to include newly discovered evidence where the method for relief is pursued by motion or petition, and the majority opinion cites no precedent therefor.

The effect of the decision of the majority is to hold that where a judgment of conviction has become final in the trial court and has been affirmed by the Supreme Court, and the terms of both courts at which the respective judgments were rendered have ended, this Court may, on motion or petition, upon the ground of newly discovered evidence, reinvest the trial court with jurisdiction to entertain a motion for a new trial and to vacate the former judgment and grant such new trial. This, in my humble judgment, endangers the finality of solemn judgments and makes uncertain the end of litigation. It is further an unwarranted extension of the jurisdiction and powers of this Court.

The majority, however, seek to justify their decision by invoking the inherent powers of this Court. I would not detract from the inherent powers of the Court but I submit that they should be exercised within the scope of the Court's jurisdiction. In 14 Am. Jur., Courts, p. 370, it is said: "It is fundamental that every court has inherent power to do all things that are reasonably necessary for the administration of justice *within the scope of its jurisdiction.*" (Emphasis ours). Section 146 of the Constitution provides: "The Supreme Court shall have such jurisdiction as properly belongs to a court of appeals." This Court may, therefore exercise such in-

herent powers, and such inherent powers only, as pertain to a court of appeals. The term of the trial court at which the judgment of conviction was rendered has now expired. The term of the Supreme Court at which the judgment of conviction was affirmed has now expired. This Court has definitely held that a motion for a new trial must be filed prior to the adjournment of the court and that when a term of court has finally adjourned, a party's right to file a motion for a new trial ends. National Casualty Co., et al v. Calhoun, 219 Miss. 9, 67 So. 2d 908. In other words, under the facts of this case the trial court has no further jurisdiction of the cause. The decision of the majority would have the Supreme Court reinvest the circuit court with jurisdiction to vacate its former final judgment and grant a new trial. I respectfully submit that this is not within the scope of the jurisdiction conferred upon the Supreme Court by the Constitution, and cannot, therefore, be justified upon the ground of the Court's inherent power. It is fundamentally true that the Supreme Court can not exercise inherent powers that are not within the scope of its jurisdiction.

For the reasons hereinbefore set forth, I am, with deference, unable to subscribe to the views and conclusions expressed in the majorty opinion. The effect of the decision of the majority is to sound the death knell of the writ of error coram nobis in this State. Hereafter the relief heretofore sought by the writ will be sought by motion or petition. Under the decision the finality of the judgment of the trial court may at any time be disturbed upon the ground of newly discovered evidence. Final judgments will have lost their sanctity and it will be difficult to predict when the end of a lawsuit is in sight.

The petitioner is not without recourse. The benevolence of the pardoning power is available to him if the facts of the case warrant its exercise.