457 So.2d 911 (1984)
In re Willie Albert SMITH.
No. 53564.
Supreme Court of Mississippi.
September 26, 1984.
Robert J. Brantley, Kirksey, Brantley & DeLaughter, Jackson, for appellant.
Edwin Lloyd Pittman, Atty. Gen. by Marvin L. White, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
HAWKINS, Justice, for the Court:
Before us is the second petition for writ of error coram nobis of Willie Albert Smith.[1] It assigns a new and distinct ground for post-conviction relief, namely: that two eyewitnesses committed perjury when they made in-court identification of Smith as the person who abducted the victim later found murdered. Attached to this petition are the affidavits of these witnesses, Kenneth Thomas and James E. Wells, that they did indeed lie when they identified Smith as the person seen struggling with the victim. If their affidavits are true, they have both committed perjury under Miss. Code Ann. § 97-9-59, and subjected themselves to a sentence of at least ten years in the state penitentiary under Miss. Code Ann. § 97-9-61.[2]
These witnesses' identification of Smith at trial formed an integral part of our opinion affirming his conviction.[3]
In his original appeal Smith filed a Supplemental Assignment of Error that the in-court identification was invalid, which we rejected. Page 574. Smith renewed this contention in his first petition for writ of error coram nobis. We again rejected this contention as having been previously considered without merit on direct appeal, 434 So.2d page 216.
In York v. State, 413 So.2d 1372 (Miss. 1982), we set out the current holdings of the United States Supreme Court and this *912 court concerning the problems relating to witnesses' identification of the accused. It is pertinent now to make more detailed observations about the trial record in this case, because we find from this record that the in-court identification of Smith by these witnesses was perilously close to violating even the lenient guidelines of York.
On March 15, 1981, between 4:30 and 5 o'clock in the morning, James E. Wells went to Kenneth Thomas's house in Jackson to request Thomas to go with him to get a check cashed. It was a Sunday morning, and shortly after 5:00 (between dark and sunrise), as Wells drove by a Tote-Sum Store on Robinson Road in the City of Jackson, Thomas noticed a Black man struggling with a White woman in the parking lot. Thomas tried to get Wells to stop, but Wells was reluctant to get involved, and drove on.
After Wells and Thomas had driven by, Sgt. George E. Otis of the Jackson Police Department stopped at the store to use the telephone. While he was there, Wells and Thomas returned around 5:30 o'clock, and reported to him what they had seen. Thomas did most of the talking.
The black man struggling with the woman was described as having a "medium Afro, medium dark complexion, rather short stature." Page 132.
The description of the vehicle was more detailed and specific. It was described as a red Pinto, approximately 1970 model, with a cracked or broken grill, some material resembling carpeting on the dashboard, and a decal of some type on the rear. Within an hour Smith was arrested driving a Pinto car of this description.
Either one or two days after March 15, 1981, Thomas was called to the Jackson Police Station to identify Smith in a line-up as the man he saw struggling with the white woman on the store parking lot. He failed to point Smith out in the line-up, telling the officers he was unable to identify such person. Prior to trial Thomas was asked by representatives of the defendant if he could identify the man in the parking lot, and he said he could not.
There was a pre-trial suppression hearing on the 7th day of July, 1981, with Smith present. Thomas saw Smith at this suppression hearing.
Trial began on July 27, 1981. The day before Thomas took the stand as a witness, he was shown five photographs of Black males, one of which was of Smith. Thomas picked Smith's photo. The next day when Thomas took the stand as a witness, he made an in-court identification of Smith.
Wells testified it was dark when he drove past the Tote-Sum Store, but not so dark that he could not see. After returning to the Tote-Sum Store and reporting what they had observed to Otis, Wells and Thomas gave the officer their addresses and left.
Wells never attended a line-up. He, too, was shown five photographs the day before he testified and Smith's photo.
He identified Smith in person for the first time in the courtroom when he testified. On cross-examination he admitted having been told there would be "a little Black man sitting in the courtroom." He admitted to talking to the police two days after the crime and telling them he could not identify the man in the parking lot, also telling Thomas the same, and later telling representatives of Smith he could not identify such man.
We thus have the rather unusual circumstance of two identification witnesses positively informing police officers within two days after the crime that they are unable to identify the culprit, and no further questioning of them by the police until trial four months later. Then, the day before they are to testify each is shown five photographs, one of which was of Smith. In the meantime, Thomas has seen Smith at a pre-trial hearing.
Unfortunately, at the trial defense counsel made no effort to exclude these in-court identifications as violative of Smith's constitutional right. It is idle to speculate what the circuit judge's ruling might have been had an in-depth hearing on this matter been conducted in chambers. Rather, it is *913 apparent from the record that defense counsel chose to exploit this tenuous identification testimony before the jury in an effort to discredit him. Counsel conducted a vigorous cross-examination. All of their prior inconsistent statements were displayed to the jury.
We do not criticize this trial strategy of a manifestly able trial lawyer, but point it out as one of the reasons we did not give greater consideration to the assignment of error that Smith's constitutional rights had been violated by the in-court identification.
Now, we are faced with a petition for writ of error coram nobis with affidavits from Thomas and Wells that they lied when they testified they were able to identify Smith at the trial. Their affidavits are as follows:
My name is Kenneth Thomas... .
I testified at a trial in Jackson, Miss. in July 1981, about facts concerning Willie Albert Smith. My testimony at that trial was untrue. I would like to state the following information as absolute fact.
(1) At trial, I identified Willie Albert Smith, the defendant in the courtroom, as a black man I saw struggling with a white woman in a parking lot in front of the Tote-Sum Store on Robinson Road about 5:15 a.m. on March 15, 1981. That testimony was completely untrue.
(2) On March 15, 1981 at about 5:00 a.m. I was a passenger in a car being driven by James Wells. We drove by the Tote-Sum Store on Robinson Road. I saw a black man and a white woman struggling. A red Pinto was in the parking lot.
(3) I did not see the face of the black man in the parking lot that morning. There is no way that I could possibly identify him.
* * * * * *
(5) After that day, I was taken by a police investigator to the district attorney's office. I was pressured to give a statement. I was told that if I did not give them a statement, I would be thrown in jail. They told me my probation would be revoked and I would go back to Parchman for 22 years. Out of fear, I agreed to sign a statement, without concern for whether that statement was true.
(6) Some time after March 15, a police investigator took me to the district attorney's office. Ed Peters gave me a stack of five photos. He told me to pick out the picture of the man I saw at the Tote-Sum Store. I told Peters that I could not identify the man. Peters insisted that I select one of the pictures as the man I saw at the Tote-Sum anyway. I looked at the pictures. I gave Peters the picture of Willie Albert Smith. I could not recognize Smith but that picture had the name "Willie Albert Smith" written on the back. I knew that this was the picture of the man Peters wanted me to identify. I knew that the man they had arrested for the crime was named Willie Albert Smith. Although I gave Peters that picture, I told him I could not identify the man in that picture as the man in the Tote-Sum parking lot.
* * * * * *
(8) At trial I testified that I could identify Willie Albert Smith as the man in the Tote-Sum parking lot. I testified that I had identified his picture as the man in the Tote-Sum Store parking lot. I testified that I had identified Smith in the line-up as the man in the Tote-Sum Store parking lot. None of this testimony was true. I have no idea who the man was in the Tote-Sum Store parking lot. I never saw his face and it is not possible for me to identify the man I saw. I gave this false and untrue testimony because I was threatened by Ed Peters and the police investigator... .
(9) I am giving this affidavit of my own free will. I have not had any peace of mind since I gave this untrue testimony at the trial of Willie Albert Smith. I want to tell the truth now so I can live with myself. I want Willie Albert Smith and his family to know that I am genuinely sorry for what I did. I have not *914 been pressured or threatened to give this statement.
 S/Kenneth Thomas
My name is James Earl Wells... . I testified at a trial in Jackson, Miss. in July, 1981, about facts concerning Willie Albert Smith. My entire testimony was not true, and I would like to state the following information as absolute fact:
(1) At trial, I identified Willie Albert Smith, the defendant in the courtroom, as a black man I saw struggling with a white woman in a parking lot in front of the Tote-Sum Store in Robinson Rd. about 5:15 a.m. on March 15, 1981. That testimony was completely untrue.
(2) On March 15, 1981, at approximately 5:00 a.m., I was driving my car, headed east on Robinson Road in Jackson. Kenneth Thomas was in the passenger seat. I drove past the Tote-Sum Store on Robinson Road. It was dark. I did not see anything happening in the Tote-Sum Store parking lot. I did not see a black man struggling with a white woman.
(3) Some time during the next week, I was taken by a Jackson police officer to the Police Station. I told them that I did not see anything at the Tote-Sum Store on March 15. The police said I was laying  that I did see a black man struggling with a white woman, and that I did see the woman being forced into a small red car. I told the police I did not see that, or anything else.
(4) The police threatened to put me in jail for withholding valuable evidence if I did not give a statement. A police officer said to "lock his butt up" until the trial, months later. I was afraid of what would happen to me, so I agreed to give a statement to the police, although it was not true.
(5) Just before the trial of Willie Albert Smith for murder, I received a subpoena. I went to the office of Ed Peters, the District Attorney. I told Peters that I could not identify the man at the Tote-Sum Store on March 15, 1981. He handed me a stack of photos and told me to look at them, and tell him which one was the black man I saw at the Tote-Sum Store. He left me alone with the photos.
(6) I turned the photos over. Each had a name on the back. One had the name "Willie Albert Smith" on the back. I picked that photo, because I knew that was the name of the man on trial. I had never seen the man in the photo before. I gave that photo to Peters when he came back to the room. I told Peters that I could not identify the man, but I gave Peters the photo with Smith's name on the back.
(7) I testified at the trial of Willie Albert Smith the next day. I identified Smith, the defendant in the courtroom, as the man who had been struggling with a white woman in the Tote-Sum parking lot on March 15, 1981. In fact, I had never seen Smith before and had no basis for that testimony; it was false and untrue. I gave that testimony only because I was pressured by the police and the District Attorney; I was afraid of what would happen to me if I refused.
(8) I give this sworn statement freely and of my own will. I have not been pressured, or threatened to give this statement.
 S/James E. Wells
As in the recent case of Sanders v. State, 439 So.2d 1271, page 1276 (Miss. 1983), when we were faced with a quite similar situation, we are again "forced to conclude that in the event" the affidavits are "accurate and truthful, this would be sufficient for the lower court to hear the petition for writ of error coram nobis."
We pass no judgment on the merits of this application, going no further than authorizing and granting leave to file.
The State first contends the petitioner failed to use due diligence either prior to or during trial. We cannot agree with this contention. These witnesses were interviewed by representatives of the defense prior to trial and both stated they could not identify Smith. The first time the defense was apprised otherwise was when each witness took the stand. Indeed, according to the trial record, it was only the day prior to *915 their testifying as witnesses that either informed the State he could identify Smith. The defense counsel cannot be faulted for not discovering this about-face prior to their taking the stand.
The State next takes Smith and his counsel to task for not learning, following the trial, from Thomas and Wells that they had committed perjury before November, 1983. That is hardly relevant to the inquiry of whether the petition should be sustained.
The State next claims there was no knowledge on the part of the State the testimony was false, and attaches affidavits of various law enforcement officers who interviewed Thomas and Wells at one time or another.
We cannot pass judgment on any of these issues simply upon the petition filed. Yet, even if we gave complete credence to every statement made in each affidavit supporting the State's brief, this still does not dispense with the central allegation of the petition, namely: Thomas and Wells committed perjury when they testified in court they could identify Smith as the man assaulting the woman on the parking lot at the Tote-Sum Store. To this Smith has attached the unequivocal affidavits of these witnesses.
We cannot escape the conclusion that Smith is entitled to a hearing on his petition. We further believe this matter can be conducted best in a state court proceeding, rather than a federal court.
We pass no judgment on the merits of the petition.
SUSTAINED.
PATTERSON, C.J., and BOWLING, DAN M. LEE and ROBERTSON, JJ., concur.
ROY NOBLE LEE and WALKER, P.JJ., and PRATHER and SULLIVAN, dissent.
ROY NOBLE LEE, Presiding Justice, dissenting:
I think that the pending Application for Leave to File Petition for Writ of Error Coram Nobis should be denied and, therefore, I dissent from the majority opinion.
Willie Albert Smith was convicted in the Circuit Court of the First Judicial District of Hinds County, Mississippi, and sentenced to suffer death, according to the laws of the State of Mississippi.
Shirley Roberts, the murder victim, was the manager of Tote-Sum Store No. 6 situated on Robinson Street in the City of Jackson. She customarily opened the store around 5:15 a.m. On the morning of March 15, 1981, upon her arrival at the store, she was assaulted, kidnapped and subsequently murdered.
Kenneth Thomas and James Wells passed the Tote-Sum store shortly after 5 a.m. in a car driven by Wells. They saw a black man in the parking lot grab a white woman who struggled with him, and saw the black man choke her. Wells did not want to become involved and they drove on. They observed a red Pinto automobile in the parking lot. The black male was forcing the woman into the car.
A short time later, Thomas and Wells returned to the parking lot and saw Jackson Police Department Officer G.E. Oatis at the scene. They made inquiry of Oatis concerning the assault and learned that Oatis had no knowledge of it.
Thereupon, they reported what they had seen and Oatis conducted a search over the parking area where he found items of personal effects, including car keys, glasses, and a woman's shoe. Oatis required Thomas and Wells to stay at the parking lot until other officers were summoned to assist in the investigation of the matter. He obtained from the men a description of the black man, though somewhat scanty, and a description of the Pinto automobile. Later in the morning, Officer Oatis saw a red Pinto automobile traveling on Robinson Road, which fit the description of the suspect's car given him by Thomas and Wells. He stopped the car, which was driven by the petitioner Willie Albert Smith. At that time, he saw Smith put something under the right side of the front seat. The object was a shoe, and was the mate to the woman's *916 shoe found by him in the parking lot. Officer Oatis observed mud and blood on Smith's hands, and, thereupon, arrested him.
The investigation then led to Smith's home, and it was determined that Mrs. Roberts had been raped and murdered. A "drag trail" was followed from the Smith house to a wooded area where the officers came to a water ditch covered with leaves from which a human foot protruded. The body in the water was identified as that of Mrs. Shirley Roberts.
Petitioner Smith appealed his conviction to the Mississippi Supreme Court which affirmed the lower court on August 11, 1982, [Smith v. State, 419 So.2d 563 (Miss. 1982)]. A petition for rehearing was denied September 22, 1982. Smith filed a petition for writ of certiorari in the United States Supreme Court, and it was denied March 21, 1983, [Smith v. Mississippi, 460 U.S. 1047, 103 S.Ct. 1449, 75 L.Ed.2d 803 (1983)].
Petitioner Smith applied to this Court for leave to file a petition for writ of error coram nobis, and that application was denied by the Court on June 1, 1983 [Smith v. State, 434 So.2d 212 (Miss. 1983)]. Petition for rehearing was denied July 27, 1983. On August 1, 1983, petitioner Smith filed a petition for writ of habeas corpus in the United States District Court for the Southern District of Mississippi, Civil Action No. JH3-0573(B).
The pending application for leave to file petition for writ of error coram nobis states the following grounds:
I. The State knowingly used the perjured testimony of James Wells and Kenneth Thomas to obtain a conviction of the petitioner Smith. Sworn statements of Wells and Thomas are attached to the application wherein each set forth that he perjured himself in identifying Smith as the black person struggling with the victim in the parking lot.
II. Officer Oatis did not have probable cause to stop the automobile of Smith and subsequently arrest him, and the evidence obtained from the automobile was inadmissible.

I.
Prior to the trial of the case, Thomas and Wells had given some description of the petitioner Smith to the officers, but they had not identified him as being Mrs. Roberts' abductor. At the trial, an in-court identification was made by those witnesses. The position of the defense at trial was that Thomas and Wells were not telling the truth and that they were perjuring themselves. A strenuous cross-examination was permitted by the court and made by the defense attorney, following that point. The same question is involved here, although somewhat extended, and it was raised by petitioner Smith in his first application for leave to file petition for writ of error coram nobis on April 27, 1983. Excerpts from that application follow:
Part Two: Constitutional Claims Relating to the Guilt Trial
D. The Admission of Impermissibly Tainted In-Court Identification

39. The admission of two impermissibly tainted in-court identifications of the petitioner irreparably prejudiced his case in violation of the sixth, eighth and fourteenth amendments.
Facts supporting petitioner's claim that the admission of the in-court identifications violated the fifth, sixth, eighth and fourteenth amendments
40. At petitioner's trial, the prosecutor put on two eyewitnesses, Kenneth Thomas and James Wells, who made in-court identifications of the petitioner as the man they saw struggling with the victim in the Tote-Sum parking lot the morning of May 15, 1981. The in-court identifications of both of these witnesses were made, despite an inadequate opportunity to observe the suspect in the parking lot, as a result of impermissibly suggestive procedures in violation of United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

*917 41. Thomas' and Wells' entire view of the parking lot altercation was from a moving car and was only 10 to 15 seconds in duration. Tr. 410. When they reported the crime twenty-five minutes later, they provided the officer with only the vaguest description of the suspect: male black, medium Afro, medium complexion, short stature. Suppression Hearing (S.H.) 68, 91. "They went on to describe mostly his vehicle ...," S.H. 68, which they described in great detail. See S.H. 68-69, 155.
* * * * * *
44. The state conducted a lineup for the purpose of obtaining eyewitness identification of petitioner. It brought Thomas to the lineup; it did not bring Wells. Thomas, however was not able to identify petitioner. Tr. 366, 401.[*] Subsequently, both he and Wells were visited by members of petitioner's family. Both witnesses reported at that time that they could not identify the man they saw in the parking lot. Tr. 366, 400, 421, 424. In addition, Wells had told the police just two days after the incident that he could not identify the man in the parking lot. Tr. 432. Nor could he the morning after the incident. Tr. 437.
* * * * * *
46. Thomas was subpoenaed and came to court on the first day of trial. At that time, he was confronted by the prosecutor and a police lieutenant in the prosecutor's office. He was handed five photographs and asked to pick out the man he saw in the parking lot. He did so, not because of a desire to give truthful testimony, but to avoid serving an additional twenty-two years.
Q All right, Mr. Thomas, you were just being a good citizen when you came down here yesterday and talked to the District Attorney and his Assistants,... when you suddenly decided to identify this defendant. You were being a good citizen yesterday, weren't you?
A No, sir.
Q You weren't?
A No, sir.
Q As a matter of fact 
A (Interposing) I was under subpoena. That's what I had to do or I would be facing twenty-two years, you know.
Q All right. And this happened in the District Attorney's office.
A Yes, sir.
Q The District Attorney was there?
A Yes, sir... .
TR 365. Indeed, this was made explicit in his conversation with the prosecutor and the police officer.
A ... They told me if I came in here lying I would be doing it a whole lot longer.
Q Okay.
A After I get through with my twenty-two years, you know.
Q They told you if you were lying  if you were lying about anything in this trial.
A I am going to jail, right.
Q You are going to jail.
A Right.
Tr. 399. And, lest Thomas forget, the prosecutor was sure to remind him on the stand as he recounted his identification of petitioner in the photo show-up. Tr. 356.
Q Are you on probation today?
A Yes, sir.
Q Are you aware of what could happen if you lie under oath?
A Yes, sir.
Q Not only the penalty for perjury but with regard to 
A (Interposing) The twenty-two years. [Emphasis added]
[*] In affirming petitioner's conviction, the Mississippi Supreme Court stated that Thomas had identified petitioner at the original lineup. Smith v. State, 419 So.2d 563, 565 (Miss. 1982). This is simply wrong. While the Mississippi Supreme Court attempted to discount the effect of Thomas' unequivocal statements on cross-examination, *918 id. 565 n. 1, the record speaks for itself.
Q. And you had been given an opportunity to identify this man before, hadn't you?
A. Yes, sir.
Q. At the lineup.
A. Yes, sir.
Q. And you didn't identify him.
A. No, sir.
Tr. ____.
Q. Are you telling us that, when they visited you on July the 18th, 1981, at that time you could identify the man?
A. No, sir, I told them I couldn't
Q. All right.
A. The same thing I told the police at the time of the lineup... .
This Court, in ruling upon Ground I (the perjury ground), said:
Fourth alleged ground for relief relates to his claim that the in-court identification of Smith by witnesses Thomas and Wells was "impermissibly tainted." This issue was raised in petitioner Smith's supplemental assignment of error and was considered by this Court on direct appeal. Smith v. State, supra, at 574. Having been fully adjudicated against petitioner Smith, this issue is barred from consideration in post-conviction relief proceedings. Holloway v. State, supra. [434 So.2d at 216].
As stated above, in the opinion affirming the lower court on direct appeal, this Court said:
Defense counsel also asserted additional argument concerning "in court identification" of the defendant by state's witness. Also discussed in the response of defense counsel is the issue of the "pretrial identification" of the defendant.
This Court has carefully considered all these matters discussed in the paragraph immediately above, and all propositions argued... . No reversible error has been pointed out by counsel, and we have been unable to find such. [419 So.2d at 574].
On the 13th day of November, 1983, Kenneth Thomas and James Wells made sworn statements for petitioner Smith wherein they stated that their testimony at the Smith trial was false and untrue.[1] The judgment of the lower court in the Smith case was affirmed by this Court on August 11, 1982, almost one and one-half years prior to those statements. When the State became aware of such affidavits, the Attorney General's Office conducted a search for those witnesses through the combined forces of its Organized Crime Division and the Jackson Police Department in order to interview them. After one and one-half months, they were finally found. Interviews were arranged with them and the attorneys who represented them were present. Attorneys from the Attorney General's Office were not allowed to record their statements and were only permitted to make handwritten notes. It developed that the attorneys representing Wells and Thomas were arranged for by petitioner Smith.[2]
The Attorney General's Office has attached to its response to the application for leave to file petition for writ of error coram nobis the affidavits of William S. Boyd, III, Special Assistant Attorney General; Edward J. Peters, District Attorney for Hinds and Yazoo Counties, Mississippi; Vaughn Davis, Jr., Assistant District Attorney for Hinds and Yazoo Counties, Mississippi; Lt. Don Bartlett, Jackson, Mississippi Police Department; Detective D.F. Fondren, Jackson, Mississippi Police Department; Detective Ronald Patton, Jackson, Mississippi Police Department; Lt. T.C. Barfield, Commander, Homicide and Robbery Division, Jackson, Mississippi Police Department; and Sgt. G.E. Oatis, Jackson, Mississippi Police Department; which affidavits are in support of the position of the State of Mississippi and contra to the affidavits of Thomas and Wells.
In Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the Court held that the presentation of known false evidence, and nondisclosure of evidence affecting credibility, are grounds for *919 retrial if the deception was material, that is if it might "... `in any reasonable likelihood have affected the judgment of the jury.'" [405 U.S. at 154, 92 S.Ct. at 766, 31 L.Ed.2d at 108]. See also United States v. Johnson, 487 F.2d 1318, 1325 (5th Cir.1974); and United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) [Mere possibility that undisclosed evidence might have aided defense or might have affected outcome of trial does not establish "materiality" in constitutional sense].
In Lang v. State, 230 Miss. 147, 92 So.2d 670 (1957), this Court, in addressing the question of newly-discovered evidence and due diligence, said:
We entertain and sustain the petition under Chapter 250, Laws of 1952, as being a petition for leave to file in the trial court a motion to vacate the judgment and for a new trial on the ground of newly discovered evidence, and such leave is hereby granted. We recognize that there must be an end to litigation, and a judgment once solemnly entered must not be lightly opened or vacated, and never except for cogent reasons. Such a petition should be confined to the narrowest limits compatible with justice; it will be sustained only if the newly discovered evidence is of such nature that it would be practically conclusive that it would cause a different result; it will not be sustained if the petitioner or his attorney knew of the existence of such evidence at the time of the trial, or could have discovered it by the exercise of due diligence; it will not be sustained if the newly discovered evidence is merely cumulative, or additional to that adduced at the trial; it will not be sustained if the newly discovered evidence merely tends to impeach other testimony offered at the trial; and it must be filed as soon as reasonably practical after the discovery of the new evidence. [230 Miss. at 171-172, 92 So.2d at 675-676].
I am of the opinion that the present application for leave to file petition for writ of error coram nobis is an extension and renewal of the question raised on direct appeal and on the first application and that the ground is not sufficient to require, or permit, granting of the application.

II.
For Ground II, petitioner Smith contends that Officer Oatis did not have probable cause to stop the Pinto automobile and to arrest him and that the evidence obtained by the search was inadmissible. However, when Thomas and Wells returned to the parking lot and spoke with Officer Oatis, he did not know that an assault had occurred. They related to him what they had seen, Officer Oatis conducted an investigation around the parking lot, saw the unoccupied automobile of Mrs. Roberts, picked up from the parking lot personal items of hers, including automobile keys, glasses and one shoe. He obtained a description of the assailant, although not in detail. He knew the assailant was driving a red Pinto automobile and he knew his general description. When he met the Pinto automobile on Robinson Road, he stopped petitioner Smith, the driver, in his investigation of a felony violation. At that time, the body of Mrs. Roberts had not been discovered and the officers were trying to save her life. Officer Oatis stopped the Pinto automobile, he saw petitioner Smith push something under the seat, which proved to be the mate to the shoe which he had found on the parking lot. Thereupon, he arrested petitioner Smith.
The facts upon which Officer Oatis relied in stopping and arresting Smith were those acquired by him at the scene of the abduction, viz, the parking lot, from Thomas and Wells, not the testimony upon the trial of the case. This ground was not presented to the Court, or assigned as error, on direct appeal from Smith's conviction, nor was it assigned as a ground in the first application for leave to file petition for writ of error coram nobis. Therefore, it may not be presented on this application and is procedurally barred.
Assuming arguendo that the ground is not procedurally barred, then we are of the *920 opinion that Officer Oatis, in the investigation of this felony violation, had probable cause to stop the red Pinto automobile, and, upon seeing the suspicious conduct of the petitioner Smith, and finding the shoe of Mrs. Roberts in the possession of Smith, had probable cause to arrest him and to conduct a search of the automobile.
I am of the opinion that this application for leave to file petition for writ of error coram nobis in the Circuit Court of the First Judicial District of Hinds County, Mississippi, should be denied, and I dissent from the majority opinion.
WALKER, P.J., and PRATHER and SULLIVAN, JJ., join this opinion.
NOTES
[1] We affirmed his conviction in Smith v. State, 419 So.2d 563 (Miss. 1982). Smith filed a petition for writ of error coram nobis with us on June 1, 1983, which assigned numerous grounds for relief, and which we denied. See: Smith v. State, 434 So.2d 212 (Miss. 1983).
[2] The prospect for one of them, Kenneth Thomas, is even worse. When he testified, he had served three years under an armed robbery conviction, with twenty-two years suspended on good behavior.
[3] Smith v. State, 419 So.2d 563 sub-paragraph Page 564: "... Thomas's driving companion, James Wells, stated that he saw the defendant grab the woman and choke her, but, not wanting to become `involved', they drove on." Page 565: "... At trial, Thomas testified that the next day he identified the defendant in a lineup as the person with whom the woman struggled outside the store.[1]

The footnote to this statement in the original opinion recognized Thomas's testimony on cross-examination was "confused and contradictory", but also noted that its credibility was a jury issue.
Page 567: "... He [Smith] was seen struggling with a woman at the Tote-Sum Store."
Page 569: In the chronology of events: "... Smith was seen leaving Tote-Sum with Mrs. Roberts, by two witnesses."
[1] In-court identification of petitioner Smith.
[2] Affidavit of William S. Boyd, III, Special Assistant Attorney General, at p. 10, exhibit to the State's Response.