CARRAWAY v. STATE.

(In Banc. May 22, 1933. Suggestion of Error Overruled June 12, 1933.)

[148 So. 340. No. 30461.]

Powell, Harper & Jiggitts, of Jackson, for appellant.

**Bidwell Adam,** of Gulfport, for appellant.

S. D. Redmond, of Jackson, for appellant.

W. D. Conn, Jr., Assistant Attorney-General,˙ for the state.

Argued orally by **Louis M. Jiggitts** and **Bidwell Adam**, for appellant, and by **W. D. Conn, Jr.**, for the state.

**Ethridge, J.**, delivered the opinion of the court.

The appellant was heretofore convicted of rape and sentenced to death, and the judgment of conviction was affirmed. 137 So. 325. After the affirmance of the case, a petition for a writ of coram nobis was sued out before the judge in vacation, and the judge declined to grant it. An appeal from the refusal of the judge to grant this writ was prosecuted here which appeal was dismissed on the ground that no appeal lay from the refusal of the judge to grant the writ in vacation. This is reported in 163 Miss. 639, 141 So. 342. Thereafter, the

present motion for a new trial was made in the circuit court and was heard in term time, which motion was denied, from which denial this appeal is prosecuted.

The motion to set aside the verdict and grant a new trial was based upon facts, or alleged facts, which were fully known to the appellant prior to the time of the trial on the merits. The petition set up as a ground for not bringing these matters to the attention of the court at the trial on the merits that he feared mob violence.

We think the record wholly fails to sustain any allegation that there was any danger of mob violence, and the record shows that during the trial on the merits there were no persons present in the courthouse other than the officers of the court, counsel for parties, juries, witnesses, and the defendant, appellant here. The appellant was defended, on the trial on the merits, by an attorney of his own selection, and this attorney states that he did not disclose to the trial court any information of any threat of mob violence; that he did not make a motion for a change of venue or for a continuance on this, or on any other ground, and that he did not ask for compulsory process to secure the attendance of two witnesses who had been summoned, and the process for whom had been returned "not found"; nor make any application for a continuance because of their absence. He says he stated to the district attorney, when asked if he was ready for trial, that he had two material witnesses, and that the district attorney stated to him that, in his opinion, it would be better to go to trial without them than for the trial to be delayed. The two alleged witnesses who were absent, and for whom process had been returned "not found," were not introduced in the present trial, nor upon the motion for a new trial after conviction, nor was there any showing as to what said witnesses would testify to, except that they would support three other witnesses as to an alibi on behalf of the appellant, the said three other witnesses having testified on the trial on the merits.

The main contention here relied upon to secure a reversal is an alleged change in the testimony on the part of a witness for the state on the trial on the merits. On that trial a deputy sheriff, Wentzell, testified to an alleged statement made by the appellant to the district attorney in the presence of that deputy sheriff and another deputy sheriff, the testimony being as follows:

"Q. Did he make any statement? A. He did.

"Q. I will ask you what he said in reference to this crime when he was asked about it. A. He said he did it, and he was sorry because the folks had practically raised him, and he also said he had gone to Biloxi that Sunday, I think prior to that, and had bought some liquor and had it in a stump pretty close to the house, and he wanted us to kill him because he had committed this deed.

"Q. Did he say whether or not he had intercourse with Mrs. Tillinghast? A. He said he did and he was sorry because they practically raised him.

"Q. Did he state under what circumstances he had done it? A. No sir . . ."

By District Attorney:

"Q. Just state what he said. A. He said he had gone to Biloxi on Sunday prior to this happening and bought a half a glass jar full of whiskey and gone back to the house and put it in a hollow stump and that he was drunk that day, and you asked him did he know what he did, and he said he did and he was sorry he had did it, and he wanted us to kill him because he said the folks had practically raised him, and he broke down and started to cry."

On the present motion, the same witness testified as follows:

"Q. Did you have occasion to go to the jail of Harrison county some time shortly after the 23rd of February, 1931, with W. M. Colmer, our District Attorney? A. I did, but I don't know the exact date.

"Q. On that occasion did you interview Tom Carra-

way who at the time was held in the Harrison county jail on a charge of rape? A. Yes sir.

"Q. I will ask you if you were there when Mr. Colmer interviewed Tom Carraway? A. Yes sir. . . .

"Q. I will ask you if Tom Carraway on that occasion made a straight out confession of his guilt to you and Mr. Colmer? A. First, I will have to state that Mr. Colmer told him who we were.

"By the Court: Tell what Tom Carraway said.

"The Witness: Yes sir he told us.

"By Mr. Adam: Do you know what he told you? A. Yes sir.

"Q. What did he say as you remember it? A. He said far as he could remember he was drunk, and he told he committed this crime.

"Q. I will ask you if he didn't say this when Mr. Colmer asked him if he committed the crime, he replied by using this language, 'they say I did it, but if I did I don't know it, I was drunk'? A. That is what he said.

"Q. That is all he said? A. He said they practically raised him, and if he did anything he was sorry because he had no occasion.

"Q. If he did it he did not know he did it, because he was drunk? A. Yes sir.

"Q. He did not make a straight out, free and voluntary confession that he committed this crime on this lady? A. No sir."

On cross-examination the witness testified as follows:

"Q. The conversation you have detailed was not all the conversation? A. No sir.

"Q. Just in answer to Mr. Adams' questions? A. Yes sir."

By Mr. Adams, counsel for appellant:

"Q. What do you mean that was not all the conversation? A. When we walked in the cell Mr. Colmer told him who I was and who he was, and told him that anything that he said could be used against him and practically all the questions you asked me.

"Q. That covers it all? A. He said they partly raised him, and they claimed he did it, but he didn't know it, because he was drunk.

"Q. So there will be no mistake about it, Mr. Wentzell, isn't it a fact he said they claim or say I did it, but if I did it, I don't know it, I was drunk? Isn't that right? A. Yes sir. And Mr. Colmer asked him, you had intercourse with this woman twice, and he said if I did, I don't know."

The district attorney testified substantially to the same effect, as follows:

"Q. Mr. Colmer, you are the district attorney of this district at this time? A. Yes sir.

"Q. And was in April 1931 when Tom Carraway was tried in this Jackson county for the crime of committing a rape on Mrs. Gammic Tillinghast? A. I was.

"Q. Did you have occasion to go to the Harrison county jail some time in the latter part of February, 1931, and interview the defendant, Tom Carraway? A. I would not say as to the date, I went there and interviewed Tom Carraway immediately after the crime was said to have been committed.

"Q. Who was present when you interviewed him? A. Mr. Foretich, the jailer, and deputy sheriff, and Mr. Wentzell, the deputy sheriff, as to whether they were both there all the time, I would not say.

"Q. What was the purpose of your interview with the defendant? A. I was District Attorney of this District, and considered it my duty to try to get the facts of the case, and I went in there and interviewed him for that purpose . . .

"Q. Was there any promise of any kind made by you or anybody present at the time you interviewed the defendant? A. On the contrary, there was none made, and I told him who I was and my purpose in coming there to interview him, and advised him that anything—

"By the Court: Just a minute, Was that interview introduced in evidence on the trial?

"By Mr. Adam: Yes sir.

"The Witness: Let me understand the court.

"By the Court: I asked if anything that Tom Carraway said in that interview was introduced.

"The Witness: I went there and interviewed him, and told him who I was and what official capacity I held, and told him we had no promises to offer him or any threats to make to him, and anything he said would be used against him, and I wanted him to tell the truth about it, and nothing but the truth.

"By Mr. Adam: I will ask you if he made a straight-out confession if he was guilty of the crime with which he was charged?

"By the Court: Confine it to the record.

"By Mr. Adam: That is what I am doing.

"By the Court: You can show that by the record. Does the record show he made a confession?

"Counsel for defendant: Yes sir."

Counsel reads from the record.

"The Witness: "I don't know what you mean by a straight out confession, I asked him a number of questions.

"Q. I will explain what I mean. A. Let me finish my answer please.

"Q. All right. A. I asked him a number of questions, and he answered those questions, first denying that he had any knowledge of the thing whatever, and then saying that he was drunk and he did not know what had happened, and then he said, on further questioning, that if they said he did it, he must have done it.

"Q. I will ask you if he didn't say this, they say I done it, if I did it, I don't know it, I was drunk, in substance, didn't he say that? A. I think that is exactly what I said, in substance what I said."

The appellant, Tom Carraway, testified on the trial on the merits of the case, and denied the commission of the crime, and denied that he was drunk, and gave a full

statement of the case from his viewpoint. He was asked on this trial on the merits as follows:

"Q. You heard what the officers had to say about a statement made by you in the Harrison county jail? A. I never had been in any trouble, and if I said that I was scared to death; I was not responsible for what I was saying, and I don't know what they come there for.

"Q. Do you remember making any such statement? A. No sir, I do not."

On cross-examination he testified as follows:

"Q. Do you remember, or didn't you tell me there in the presence of Mr. Wentzell, the gentleman that testified awhile ago, that you did not know what happened, that you were drunk all that afternoon? A. I probably was drunk, but I passed it on.

"Q. You did tell me that? A. I told you I was drunk.

"Q. Didn't you tell me you were so drunk you did not know what happened? A. I said when I got home.

"Q. You do not know that is the truth, that you went back there when you came back from Crutchfield's store, and you went back out there in the woods, and that you caught Mrs. Tillinghast? A. No sir, I was at Duvic's store at the time.

"Q. What time? A. Between twelve-thirty and one o'clock, and stayed there until one-thirty or two, or two-thirty. . . .

"Q. You know where you were and what you were doing all the time that day? A. Yes sir.

"Q. Didn't you tell Mr. Wentzell and Mr. Foretich and me in the jail at Gulfport that you were so drunk that you did not know what happened? A. I was not so drunk.

"Q. Didn't you tell me that over there? A. I don't remember.

"Q. You were not drunk that day? A. No sir."

It will be seen from this testimony given on the trial on the merits that the district attorney was trying to bring out from the defendant the very facts which Mr.

Wentzell, the deputy sheriff, testified to on the present motion, and the jury must have gotten the idea that the district attorney was trying to develop from the appellant that Wentzell's recollection was not accurate.

On the trial on the merits, the witness had his attention directed to precisely what happened at the time the confession was made, and he must have known who was present, and exactly what happened. He, of course, should have communicated to his attorney full information about what happened on that occasion, and should have testified on the trial on the merits the full truth of the matter.

It appears from a study of the present record, and from the original record, that the defendant, appellant here, knew all the facts involved at the time the trial was in progress. Of course, his attorney must be charged with the knowledge of what the client knew, or at least the client cannot plead his failure to disclose to his attorney all the pertinent facts as to anything that happened in connection with the charge.

It is well settled in this state that there is no ground for a new trial when all the facts beneficial to the client's interest were well known to him. Housten v. Smith, 2 Smedes & M. 597; Davis v. Presler, 5 Smedes & M. 459.

In the trial on the merits, in the case involved here, no cross-examination of the witness Wentzell was made, and neither Foretich nor Colmer were placed on the stand, although the evidence disclosed that they were both present when the statement was made.

It is not error to overrule a motion for a new trial on the ground that a witness on the opposite side testified to something not testified to on the committing trial. Hughes v. State, 2 Miss. Dec. 88.

A new trial will not be granted where the alleged injustice in the verdict was the result of the negligence of the party or his counsel. Green v. Robinson, 3 How. 105; Thompson v. Williams, 7 Smedes & M. 270; Ennis v. Yazoo & M. V. R. Co., 118 Miss. 509, 79 So. 73.

The evidence here brought out is not newly discovered evidence, because the appellant knew exactly what had happened at the interview between him, the district attorney, and the deputy sheriff.

In Mississippi Digest Anno., Vol. 3, New Trial, Section 102, it is said that: "A party asking for a new trial on the ground of newly discovered evidence, must satisfy the court that the evidence has come to his knowledge since the trial, and that it was not owing to want of diligence that it was not discovered sooner, and that it would probably produce a different result if a new trial be granted," citing Hare v. Sproul, 2 How. 772; Rulon v. Lintol's Heirs, 2 How. 891; Garnett v. Kirkman, 41 Miss. 94; Bledsoe v. Doe ex dem. Little, 4 How. 13; Wright v. Alexander, 11 Smedes & M. 411; and Dean v. Young, 13 Smedes & M. 118.

It was also held that newly discovered evidence which is merely cumulative, or which simply tends to impeach the testimony of one of several witnesses, is no ground for a new trial. De Marco v. State, 59 Miss. 355; Vanderburg v. Campbell, 64 Miss. 89, 8 So. 206.

It is perfectly evident to any lawyer that, if litigation is to be finished, and ever come to an end, the rules of diligence should be applied to all litigants, and they should be required to present their contentions while the litigation is in progress if the facts are known to them, or could, by reasonable diligence, be known. A party will not be permitted to disturb a judgment when he is guilty of laches or negligence in reference to the matter.

In 34 Corpus Juris 263, section 488, it is said that: "A party who has knowledge of the judgment against him is required to exercise reasonable diligence in seeking to have it set aside, and his unexcused delay in making the application, amounting to laches, will justify the court in refusing the relief asked, especially where, under the circumstances of the particular case the vacating of the judgment would work undue hardship to the opposing party, or where rights of innocent third persons have

intervened.'' On page 278, section 496, it is said that: ''The fact that a judgment was obtained through fraud or collusion is universally held to constitute a sufficient reason for opening or vacating such judgment in a proper form of proceeding, either before or after the term at which it was rendered, courts of record possessing an inherent common-law power in this behalf, which is not dependent upon legislation, although in some states statutes expressly confer power to vacate judgments upon the ground of fraud and regulate its exercise. Inferior courts not of record do not possess this power, unless conferred by statute. The authority to set aside judgments for this cause after the term is limited to cases where the fraud complained of was practiced in the very act of obtaining the judgment, and all cases of fraud which might have been used as a defense to defeat the action are excluded; the fraud must be extrinsic and collateral to the matter tried, and not a matter which was actually or potentially in issue in the action, unless the interposition of such defense was prevented by fraud, accident, or the act of the opposite party without fault or blame on his own part.''

In a case note to Collins v. State, 97 Am. St. Rep. 368, it is said that: ''The issues which may properly present themselves for trial do not involve or permit a re-examination or retrial of any issue of law or fact which was expressly or impliedly presented for decision by the court before rendering the judgment from which relief is sought. Doubtless the complaint on which the judgment is based will not be considered for the purpose of determining its legal sufficiency, and the pleadings will not be looked into for the purpose of considering the nature of the cause of action or of defense and of withholding relief if found not to be equitable or meritorious: Higbie v. Comstock, 1 Denio [N. Y.] 652. The record of the case in which the judgment was pronounced cannot be contradicted; the errors assigned must be consistent with it. Hence, the trial cannot involve the hearing of evidence

to show that the statements of such record are false: Holford v. Alexander, 12 Ala. 280, 46 Am. Dec. 253; Williams v. Edwards [34 N. C.] (12 Iredell's Law) 118. This rule applies when an attempt is made to attack a sheriff's return of the service of a writ of notice: Shoffet v. Menifee, 4 Dana [Ky.] 150; Bolling v. Anderson, 1 Tenn. Ch. 127. The whole matter at issue involved in the original trial is not opened for a new trial, but only the questions presented relating to alleged errors of fact: Breckinridge v. Coleman, 7 B. Mon. [Ky.] 331. Conflicting evidence will not be heard relating to the existence of the cause of action or of the ground of prosecution upon which the judgment in a civil action or a criminal proceeding was founded: Dobbs v. State, 63 Kan. 321, 65 Pac. 658." On page 372 of 97 Am. St. Rep., it is said that: "Proceedings by writ of error coram nobis are not exempt from the general rule that relief may be denied to a party because of his own negligence or laches. If he knew of the alleged error of fact at the time the judgment was entered and did not avail himself of it, this may preclude him from any subsequent proceeding for his relief."

There are further cases upon this subject with notes cited in People v. Reid, 195 Cal. 249, 232 Pac. 457, 36 A. L. R. 1443; Partlow v. State, 194 Ind. 172, 141 N. E. 513, 30 A. L. R. 1414; Alexander v. State, 20 Wyo. 241, 123 Pac. 68, Ann. Cas. 1915A, 1282 and note; Boyd v. Smyth, 200 Iowa, 687, 205 N. W. 522, 43 A. L. R. 1381; 10 A. L. R. 648; 3 Ann. Cas. 329. In Lewis v. State, 155 Miss. 810, 125 So. 419, it was held that: "Where convict in proceeding under Code 1906, section 1524 (Hemingway's Code 1927, section 1351), for an order fixing date for execution of sentence, presented suggestion of insanity, court was not required to order trial on issue of insanity where issue had been tried in main trial and convict did not allege that insanity arose subsequent to trial."

These authorities all show that where a matter has been presented by issues during the trial, and the party neg-

lects to present all the evidence at his command, the case cannot be tried on a motion for a new trial, or a writ of error coram nobis. The judgment cannot be set aside merely on the ground that certain witnesses did not testify on the trial. The party must be prepared to know the facts when the case is brought for trial, and the fact that he knows, or by reasonable diligence, could have known, must be considered. The mere fact that a witness changes his testimony after the trial is ended is no ground for a new trial.

When the case on appeal was heard on the merits, the attorney representing the appellant in the court below did not file a brief or assignments of error; but the court, under its usual practice, went carefully through the record, and carefully scrutinized the trial from beginning to end, and found nothing to warrant us in reversing the judgment of the court below. The testimony which counsel presented in his motion for a new trial shows that he did not present to the trial judge any reason whatever for not proceeding with the trial. He chose deliberately to go to trial, when he was, or could have been, possessed of all the facts, and the evidence shows conclusively that there was no reason for his not availing himself of any process or remedy afforded him by law. On cross-examination of this witness on this motion, it was demonstrated that there was no reason to apprehend mob violence, or to prevent counsel from exercising every legal right accorded him by law.

This court, throughout its history, has been exceedingly careful to accord to every defendant, regardless of race, color, or creed or condition, his legal rights and a fair trial. In Hampton v. State, 88 Miss. 257, 40 So. 545, 546, 117 Am. St. Rep. 740, where a defendant had been denounced as being a mulatto, Judge CALHOON said: "Mulattoes, negroes, Malays, whites, millionaires, paupers, princes, and kings, in the courts of Mississippi are on precisely the same exactly equal footing. All must be tried on facts, and not on abuse. Only impartial trials can pass the Red Sea of this court without drowning.

Trials are to vindicate innocence or ascertain guilt, and are not to be vehicles for denunciation." See, also, Fisher v. State, 145 Miss. 116, 110 So. 361, 365; Johnson v. State, 107 Miss. 196, 65 So. 218, 51 L. R. A. (N. S.) 1183. In closing this opinion (Fisher v. State, supra), we said that: "The duty of maintaining constitutional rights of a person on trial for his life rises above mere rules of procedure, and wherever the court is clearly satisfied that such violations exist, it will refuse to sanction such violations and will apply the corrective."

We have carefully and patiently given full consideration to the motion and to the evidence in this case, but find no error therein, and the judgment of the court below will be affirmed, and Wednesday, June 28, 1933, fixed as the date of execution.

Affirmed.

**Griffith, J.**, delivered a dissenting opinion.

When this case was first before the court, 137 So. 325, the record was drawn by me, and was by me presented to the full court, and a short memorandum opinion was written by me in which it was simply stated that the verdict was supported by the evidence, and that no reversible error appeared of record. Upon the examination of the original record, I was much impressed with certain features of the testimony of the female alleged to have been injured, which features in many material respects seemed improbable and others contradictory and of a suspicious character. But as corroborative of the issue in chief, there was the testimony of a deputy sheriff known for years by me to be reliable, experienced, and fearless, and this witness testified in positive terms that in company with the district attorney he had visited the appellant in jail in an adjoining county the next day after the commission of the alleged crime and that the appellant made an unqualified confession of his guilt. This witness having been introduced by the district attorney who was present at the time of the alleged con-

fession, it impressed me, as of necessity it must have impressed every juror, that this confession so testified to was vouched for by the district attorney as being a correct representation to the jury by the said witness, else the district attorney knowing the testimony not to be accurate and true, would not have put this witness on the stand thus to testify, and hence the case was affirmed.

But now, remarkable to say, the said witness who then so positively testified, has retracted his testimony, which of all was the most damaging to appellant, and admits that appellant made no such confession, and the district attorney now introduced as a witness admits that no such confession was made and that he knew it at the time of the original trial. So it is then that the facts stand out undisputed, that in a case which is the hardest of all to defend and where the passions of the community are the most easily and generally aroused against the accused, the natural tendency towards a conviction was furthered and enforced beyond hope of defense by the use by the district attorney of an alleged confession which he knew from his own absolute personal knowledge was never made, and which he admits he then knew was not made. Yet, to sustain and hold on to a conviction thus obtained, the majority has written a thirteen page manuscript opinion, casting the blame for this kind of maladministration of justice upon the ignorant and quavering appellant. It is impossible for me to sanction such a result, and I hereby record my vote as dissenting from it.

And in writing what I do about what was done, I do not wish to be understood as assuming that the district attorney was actuated by intentionally wrongful purposes in getting the testimony in the false and prejudicial light in which it appeared. On the contrary, it is my belief that knowing the intelligence and long experience of the said deputy sheriff, the district attorney put him on the stand without having previously conferred with him and was surprised by the nature of the testimony given, but having elicited it, was then in the embarrassing

position of having either to take the stand and dispute the said testimony and make the court and jury to know that an incorrect version had been given by the witness or else ask that the jury be discharged and the case continued to another day to be heard by another jury. Now, why was not one or the other of these two courses taken, or some course which would have relieved the appellant of the wrong done him by this incorrect testimony on the part of the state—testimony known by the district attorney then and there to be incorrect and grossly prejudicial to the person on trial for his life? The answer to that inquiry must be the same as that which was in the mind of the district attorney when earlier in the day he had advised the attorney for the appellant against the course of delay to procure material witnesses who had not appeared although residents of the county and within half an hour's drive from the courthouse. Could anybody be actually deceived that there was a fear of mob violence, apprehended as likely to break forth in an irresistible storm unless swift work and a certain conviction should be obtained on that very day and without delay? And so it was that the district attorney having found himself in an attitude towards the helpless defendant, as to which the district attorney felt himself almost equally helpless, allowed the matter to stand, and, of course, the verdict of guilty as charged followed as quickly as the foreman could write it out and with his fellow members get it back into open court. It seems to me that it must require a considerable effort and only after passing almost insurmountable difficulties that an impartial mind can rest upon any other conviction than that this unfortunate defendant has not had a fair trial, or to use a term of common parlance, has not had a fair deal; and it is my conception of the judicial duty, which I say with deference to those who differ from me, that in such a case the court of last resort, far removed from the scene and the influences which often so strongly operate to bring about results such as are here shown, should apply a corrective and grant a new trial in which

a fair deal may be had. Technical rules of procedure are, of course, necessary and an observance of them is essential; but the requirements of common and honest justice on the merits in an issue of life and death rise far above mere rules of procedure. It seems to me in the light of what has now been developed, that this appellant is being ordered to the gallows out of respect to technical rules and that the merits have been subverted instead of being held aloft, and that such a result is not only an injustice, but is hurtful to the law and detrimental to that high regard in which it should be held.