492 So.2d 260 (1986)
Willie Albert SMITH
v.
STATE of Mississippi.
No. 56301.
Supreme Court of Mississippi.
March 19, 1986.
Rehearing Denied August 13, 1986.
*261 Robert J. Brantley, Jr., Jackson, Albert X. Bader, John J. Kenney, David Massengill, New York City, for appellant.
Edwin Lloyd Pittman, Atty. Gen. by Marvin L. White, Jr., and Amy D. Whitten, Sp. Asst. Attys. Gen., Jackson, for appellee.
Before PATTERSON, C.J., and SULLIVAN and ANDERSON, JJ.
SULLIVAN, Justice, for the Court:
This is an appeal from a denial of a new trial on a petition for a writ of error coram nobis. It must be remembered throughout this opinion that the evidence at the original trial was overwhelming beyond a reasonable doubt that Willie Albert Smith did brutally murder Shirley Roberts on March 15, 1981. It also must be remembered, however, that it has been clearly established that two of the state's witnesses committed perjury at this trial. Constrained by the overwhelming evidence of guilt and the case precedent in this regard, we hold that a new trial is not required.

HISTORY OF THE CASE
In the early morning hours of March 15, 1981, Shirley Roberts was abducted from the parking lot of the Tote-Sum store, where she worked, on Robinson Street in Jackson, Mississippi. A few hours later *262 her body was found. As a result of this, Willie Albert Smith was indicted and tried in the Circuit Court of the First Judicial District of Hinds County for capital murder.
The circumstantial evidence presented at trial was overwhelming that Smith had killed Roberts while engaged in the crime of robbery. In addition to the circumstantial evidence, there was the testimony of Kenneth Thomas and James Wells. They testified that at approximately 5:30 on that morning of March 15th they rode past the Tote-Sum store and saw a black man, who was in a red Pinto, attack and struggle with a white woman in the parking lot. They did not stop then, but when they returned in a few minutes the Pinto was gone and there was no one in the parking lot but a policeman. They informed the policeman, who did not know what had occurred, as to what they had seen. The subsequent investigation quickly led to Smith being stopped while in a red Pinto and to the discovery of the body of Shirley Roberts behind his apartment building. Thomas and Wells made in-court identifications of Smith as the assailant they saw that morning.[1]
On July 30, 1981, Smith was convicted of the murder of Shirley Roberts and sentenced to death. This conviction was affirmed on August 11, 1982. Smith v. State, 419 So.2d 563 (Miss. 1982). Smith's petition for rehearing was denied on September 22, 1982, and the United States Supreme Court denied his petition for writ of certiorari. Smith v. Mississippi, 460 U.S. 1047, 103 S.Ct. 1449, 75 L.Ed.2d 803 (1983).
On June 1, 1983, this Court denied Smith's first petition for post-conviction relief. Smith v. State, 434 So.2d 212 (Miss. 1983). The petition for rehearing on same was denied July 27, 1983. On August 1, 1983, Smith filed a petition for writ of habeas corpus in the United States District Court for the Southern District. This action is pending.
On January 31, 1984, Smith filed a second petition for writ of error coram nobis, alleging new material facts as shown by the affidavits of Kenneth Thomas and James Wells attached to the petition, namely, that Thomas and Wells had lied when they made the in-court identifications of Smith as the assailant. (The affidavits may be found in their entirety in the opinion, cited below, which granted leave to file the petition in lower court.) The petition alleged that the state knowingly used the perjured testimony and that the affidavits showed that there was no constitutional basis for the initial stop of Smith.
In a five-to-four decision, the Court granted leave to file the petition in Hinds County Circuit Court. In Re Smith, 457 So.2d 911 (Miss. 1984). The Court noted that the central allegation was that Thomas and Wells had committed perjury. A hearing was had on October 10, 1984, before Judge William F. Coleman, who was the same judge who presided in the original trial. He denied the petition on January 16, 1985, finding that the petitioner had failed to prove that the witnesses committed perjury and that there was no presentation of false evidence on the part of the prosecution. Smith has appealed.

DID SMITH PROVE THAT THOMAS AND WELLS COMMITTED PERJURY AT THE ORIGINAL TRIAL AND, IF HE DID, IS HE ENTITLED TO A NEW TRIAL?
In Rogers v. Jones, 240 Miss. 610, 618-19, 128 So.2d 547, 551 (1961), the Court stated the purpose of the writ of error coram nobis:
The purpose of the writ of coram nobis is to bring before the court rendering the judgment matters of fact which, if known at the time the judgment was rendered, would presumably have prevented its rendition. It cannot be employed as an appeal from an adjudicated question of law and fact nor can it be *263 employed where there are other adequate remedies available. Wetzel v. State, 225 Miss. 450, 76 So.2d 188, 194, 846, 78 So.2d 774, 84 So.2d 429, 91 So.2d 750; Corry v. Buddendorff, 98 Miss. 98, 54 So. 84; Bennett v. State, 106 Miss. 103, 63 So. 339; Dolan v. State, 195 Miss. 154, 13 So.2d 925.
In Lang v. State, 230 Miss. 147, 92 So.2d 670 (1957), this Court granted a petition for leave to file in the trial court a motion to vacate the judgment and for a new trial on the ground of newly discovered evidence, treating the petition as a remedy supplemental to the writ of error coram nobis. The allegations were that there was newly discovered evidence which showed that another person may have committed the rape for which the petitioner was convicted. A hearing was had after which the trial judge denied the motion for a new trial.
The petitioner appealed, and this Court reversed and remanded for a new trial. In regard to the hearing in the trial court, the Court said, "The purpose of such hearing was to give the State an opportunity to controvert the allegations, demand proof, if it so desired, and offer such contradictory evidence as it might desire." Lang v. State, 232 Miss. 616, 620, 100 So.2d 138, 140 (1958). In any event, the petitioner must, at the hearing, prove his allegations by clear and convincing proof before the final judgment will be set aside and a new trial ordered. Sanders v. State, 440 So.2d 278, 288 (Miss. 1983).
Even if the petitioner is successful in proving his allegations regarding the newly discovered evidence, there still must be a determination concerning the "probative effect of such evidence to produce a different result on a new trial." Howell v. State, 354 So.2d 1124, 1127 (Miss. 1978).
Of course, if newly discovered evidence will not probably produce a different result or induce a different verdict, it is not sufficient to warrant the granting of a new trial. Carraway v. State, 167 Miss. 390, 148 So. 340; Thornton v. State, 178 Miss. 304, 170 So. 541; Stewart v. State, 203 Miss. 295, 33 So.2d 787; Brockman v. State, 216 Miss. 314, 62 So.2d 362; Townsel v. State, [228] Miss. [110], 87 So.2d 481. But, conversely, if, by legal standards, it will probably produce a different result or induce a different verdict, it is sufficient and should require a new trial. This is the true rule.
Lang v. State, 232 Miss. at 624, 100 So.2d at 142.
In conjunction with the above rule, the Court has adopted criteria to be considered on a motion for a new trial on the grounds of newly discovered evidence:
To warrant the granting of a new trial on the ground of newly discovered evidence, it must appear that the evidence is such as will probably change the result if a new trial is granted, that it has been discovered since the trial, that it could not have been discovered before the trial by the exercise of due diligence, that it is material to the issue, and that it is not merely cumulative, or impeaching. See also Stewart v. State, supra; Carraway v. State, 1933, 167 Miss. 390, 148 So. 340; Brockman v. State, 1953, 216 Miss. 314, 62 So.2d 362.
Townsel v. State, 228 Miss. 110, 118-19, 87 So.2d 481, 484 (1956). (cited in Lang, 232 Miss. at 624, 100 So.2d at 142) (quoting 39 Am.Jur., New Trial, section 158).
It was also said in Townsel that the determination as to whether the newly discovered evidence is such as will probably change the result if a new trial is granted is to be determined by the trial court in its discretion. 228 Miss. at 120, 87 So.2d at 485. In fact, our scope of inquiry on appeal is to determine whether the trial court abused its discretion in making this determination, as well as in making the determination of whether the allegations were sufficiently proven. Howell v. State, 354 So.2d at 1127. To do this we must look closely to the evidence adduced at the hearing.
The evidence presented at the hearing clearly showed that from the time of the incident until the day before the trial started in late July, 1981, neither Thomas nor Wells identified Smith as the assailant. In *264 the statement given by Wells to police three days after the incident, he indicated that he would not be able to identify the assailant since he did not get a good look at him. The police officers who investigated the murder conceded that Wells was not able to identify the assailant; that was the reason they did not have him attend a lineup. On the day after the incident, Thomas did attend a lineup which included Smith; however, it is now undisputed that at that time he did not identify Smith.
Both Thomas and Wells made statements to representatives of Smith a few days before the trial that they could not identify the assailant. The prosecuting attorney even admitted that they were proceeding as if the case would be based on circumstantial evidence with no eyewitness identification until the day before the trial when Thomas and Wells identified Smith from a photograph lineup.
Since trial, Thomas and Wells have on three occasions stated that they lied at the trial when they identified Smith as the assailant. This is in addition to their sworn affidavits which accompanied their petition and it includes statements to then assistant attorney general Boyd. Thomas and Wells refused to testify at the hearing, invoking their constitutional right against self-incrimination. They have never attempted to retract their admissions of perjury.
We hold that the evidence adduced at the hearing clearly shows one thing  Thomas and Wells lied when they made the in-court identifications of Smith as the assailant they saw that morning. However, this does not end our inquiry. We still must determine what will be the probable effect of this new evidence, or more proper  lack of evidence, if a new trial is granted.
This Court has held that the mere fact that a witness changes his testimony after trial is not grounds for a new trial unless the perjured testimony was knowingly used by the prosecuting officials to obtain a conviction. Riddell v. State, 413 So.2d 737, 740 (Miss. 1982); Peeples v. State, 218 So.2d 436, 437 (Miss. 1969); Roberson v. Quave, 211 Miss. 398, 403, 51 So.2d 777, 779 (1951); Dolan v. State, 195 Miss. 154, 159, 13 So.2d 925, 926 (Miss. 1943). However, the determination of whether a new trial should be granted must be made, by the trial court, on a case-by-case basis, taking into account all the relevant facts and circumstances. And this Court has reversed and remanded for a new trial when prosecution witnesses repudiated their testimony after trial although there was no finding that prosecuting officials knowingly used the perjured testimony. See Gathings v. State, 46 So.2d 800 (Miss. 1950) (not reported in state reports). Indeed it would be absurd to say that a petitioner could prove that a witness committed perjury and that a determination could be made that without such false testimony there was a significant probability that a different result would be reached upon a new trial, yet he would be entitled to a new trial only if he could also show that the prosecuting officials knowingly used the perjured testimony.
It is also true that recanting testimony is to be viewed with suspicion both because of its inherent unreliability and because of our reluctance to set aside solemnly entered judgments except for clear and cogent reasons. Bradley v. State, 214 So.2d 815 (Miss. 1968). Our criminal judicial system, which relies so heavily on witness testimony, could not function if final judgments were constantly vacated on the basis of repudiation of testimony. The rules and criteria we have set forth will prevent this and at the same time protect those petitioners who are rightfully entitled to a new trial because of the perjured testimony. To reiterate, the petitioner is entitled to a new trial only if he clearly proves his allegations concerning perjured testimony and only if the criteria of Townsel, supra, is met, including a finding that the perjured testimony was such that there is a probability that a different result will be reached upon a new trial.
It has been held that a new trial will be granted only if the new evidence makes it practically conclusive, or creates a substantial *265 probability, that a different result will be reached upon a new trial. Sanders v. State, 440 So.2d 278, 288 (Miss. 1983); Johnson v. State, 359 So.2d 1371, 1375 (Miss. 1978); Lang v. State, 232 Miss. 616, 100 So.2d 138 (1958). However, here we are dealing with the ultimate final judgment  death. There is no margin for error. Similar to our holdings that normally harmless error becomes reversible error when the penalty is death, we hold that in death penalty cases there must only be a reasonable probability that a different result will be reached if a new trial is had without the perjured testimony. This is a different inquiry from that in determining whether any error committed at trial was harmless beyond a reasonable doubt, yet it is similar in that we must look at the evidence adduced at trial, absent the perjured testimony, and determine whether there is a sufficient probability that a different result will be reached upon a new trial if this is the only evidence presented.
Smith contends that, since four jurors were seated who had stated in voir dire that they could not convict solely on circumstantial evidence, the fact that the only in-court eyewitness identification was false requires a new trial. This is not true for three reasons.
First, a close look at the voir dire concerning the four jurors shows that none of them stated that they could not follow the law concerning circumstantial evidence, pursuant to a proper instruction on such, and vote for a conviction even if sufficient circumstantial evidence was shown by the state. If they had, it would have been proper to exclude them. Instead, following a simplistic example of circumstantial evidence by the prosecuting attorney, the four prospective jurors indicated that they would have trouble convicting just on circumstantial evidence and would prefer more direct evidence. None of them expressly said that they would have to have an eyewitness. Faced with the overwhelming circumstantial evidence against Smith, it is reasonable to assume that these jurors would have voted to convict even without the perjured in-court identification. See Pruett v. State, 431 So.2d 1101, 1108 (Miss. 1983) (juror who stated he could not vote for the death penalty could change his mind).
Furthermore, a close look at the entire testimony of Thomas and Wells shows that, at the conclusion of each, the jury did not have before it the unequivocal identification of Smith as the assailant. Thomas admitted on cross examination that he had not identified Smith at the lineup and that he made the statement a few days prior to trial that he could not identify the assailant; however, he did testify that he could have at both times but just did not say so. The fact that he was on 22 years probation for armed robbery was thoroughly pointed out to the jury, as was the fact that this had been mentioned to him by the prosecuting attorneys when he attended the photograph lineup the day before trial. He admitted that he had seen Smith at the suppression hearing, at which time he had not yet identified him to anyone.
Wells' identification, even on direct, was hardly positive. On cross-examination, he admitted that the first time he had been able to identify the assailant was the day before at the photograph lineup. Prior to that, he had told the police that he could not identify him and he had stated that he could not just a few days prior to trial. It was also brought out that neither Wells nor Thomas actually saw the assailant put the woman in the car.
It was reiterated in the prosecuting attorney's closing argument that Thomas and Wells had identified Smith as the assailant they saw that morning; however, it was also reiterated in the defense's closing argument that these identifications had been shown to be unreliable. In summary, even if the four jurors had unequivocally stated that they would require eyewitness testimony linking Smith to the murder, at the conclusion of the trial all they had before them was the thoroughly impeached in-court identifications by Thomas and Wells; nevertheless, they voted to convict.
*266 Finally, and most important, our present inquiry does not focus on the effect of the perjured testimony upon the original trial; instead, it focuses on the probable effect of the lack of the perjured testimony on a new trial. The inquiries are related, however, since it is important to look at what the convicting jury had before it as opposed to what the new jury will not, which in this case is the in-court identifications by Thomas and Wells which were shown at trial to be unreliable and which have been shown since to be false. This leaves the overwhelming circumstantial evidence against Smith.
Of course, even a capital murder case may be based wholly upon circumstantial evidence. See Billiot v. State, 454 So.2d 445, 461 (Miss. 1984). We must assume that upon a new trial the jurors will be properly instructed as to the law and that they will follow such instructions. A close look at the circumstantial evidence presented at trial shows beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence that Smith did murder Shirley Roberts.
Though we have held that the evidence at the hearing clearly showed that Thomas and Wells lied when they made the in-court identifications, the fact remains that they did ride by the Tote-Sum at approximately 5:30 a.m. on March 15 when Shirley Roberts was being attacked, and that at least Thomas told the officer at the scene that he had seen a black man attack and struggle with a white woman outside the Tote-Sum store. He also related to the officer that the man and woman had apparently left the scene in a small red car. Roberts' car was in the parking lot and she was to open the store that morning. A search of the immediate area produced one tennis shoe, identified as belonging to Shirley Roberts, and brass knuckles identified as looking like ones shown to a witness by Smith that night prior to the incident. A twenty-dollar bill, car keys, and eyeglasses with accompanying chain, similar to ones Roberts wore, were also found lying on the ground.
Shortly thereafter, the officer observed a red Pinto approaching the store; the driver turned the vehicle around approximately 300 yards from the store and proceeded in the opposite direction. The officer pursued and stopped the vehicle, which was solely occupied by Willie Albert Smith.[2] The officer testified that when he pulled Smith over he observed him reach over and place something under the passenger's side of the seat. A tennis shoe was found under the passenger's seat. This shoe and the one found in the parking lot were identified together as a pair of tennis shoes belonging to Shirley Roberts.
The subsequent investigation led to a search of Smith's apartment where a purse and sweater were found on the bed, and where a lock and keys were found on the floor in the same room. All of these items were identified as belonging to Shirley Roberts. Behind the building, footprints through the mud led to a "drag trail" at the end of which the body of Shirley Roberts was found in a ditch. She was fully clothed with the exception of her shoes; however, her shirt was on inside out. She had been strangled to death and there were several other visible injuries to her body. A pair of shoes belonging to Smith with what appeared to be fresh mud on them were also found in the bedroom.
Swabs taken from Smith's hands that morning resulted in a positive presumptive test for blood of human origin. Also found on the bed was a pair of khaki pants belonging to Smith, which he had worn that night, that had blood stains on them and what appeared to be mud. The blood taken from the pants was determined not to be Smith's, but was determined to be of a type identical to that of Shirley Roberts, which, according to the tests ran, only .298% of the population had.
A $100 bill was found in the khaki pants, and another $100 bill was found on Smith. It was known that Shirley Roberts had a *267 large amount of cash on her prior to her death, including at least one $100 bill.
Certain hair samples taken from the bed clothing found in Smith's apartment exhibited the same microscopic characteristics as hair samples from Shirley Roberts. Pubic hair samples taken from the bed and sweater, found on the bed, exhibited the same microscopic characteristics as pubic hair samples from Shirley Roberts. Pubic hair combings obtained from Shirley Roberts were examined and one foreign pubic hair was found that exhibited the same microscopic characteristics as the hairs in the pubic hair sample from Smith.
Smith testified and denied that he murdered Roberts. However, his testimony of what transpired that morning hardly presents any reasonable hypothesis consistent with innocence.
We conclude that, on the basis of this overwhelming evidence, there is not even a reasonable probability that a different result would be reached if a new trial is had without the false in-court identification of Smith as the assailant seen by Thomas and Wells that morning.

DID SMITH PROVE THAT THE PROSECUTING OFFICIALS KNOWINGLY USED PERJURED TESTIMONY?
As pointed out earlier, a new trial may be required because of perjured testimony even though there is no showing that the prosecuting officials knowingly used the perjured testimony to obtain the conviction. If there is a showing that the prosecuting officials knowingly used the perjured testimony to obtain the conviction, however, a new trial is required "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342, 349-50 (1976). See also Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104, 109 (1972).
A new trial may also be required if the prosecuting attorney knowingly, or even negligently, allows false testimony, which he solicited, to go uncorrected. Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217, 1221 (1959). See also Martinez v. Wainwright, 621 F.2d 184, 186-88 (5th Cir.1980). This is equally true even if "the false testimony goes only to the credibility of the witness." Napue, 360 U.S. at 269, 79 S.Ct. at 1177, 3 L.Ed.2d at 1221. See also Giglio, supra; King v. State, 363 So.2d 269 (Miss. 1978). Furthermore, the fact that the witness might have been attacked on cross-examination concerning the false testimony, thereby affording the jury an opportunity not to believe his testimony in this regard, does not alone make it non-reversible error. See Napue, 360 U.S. at 270, 79 S.Ct. at 1177, 3 L.Ed.2d at 1221.
We cannot hold that the out of court statements of Thomas and Wells introduced into evidence at the hearing clearly showed that the prosecuting attorneys knowingly used perjured testimony in order to obtain the conviction. However, a record cannot lie and the records from the original trial and the hearing showed that on at least one occasion the prosecuting attorney was at least negligent in allowing false testimony, which he had solicited on direct examination, to go uncorrected.
When Thomas testified, he was asked by the prosecuting attorney if he had identified Smith at the lineup conducted the day after the murder. Thomas responded that he had. In fact, he had not and this was clearly shown in the police file which was introduced into evidence at the hearing. (This information was not before this Court on direct appeal.)
The fact that the prosecuting attorney who asked the question may not have actually known this is immaterial since knowledge of the information in the police file is imputed to him. United States v. Agurs, 427 U.S. at 110, 96 S.Ct. at 2400, 49 L.Ed.2d at 353; Giglio v. United States, 405 U.S. at 154, 92 S.Ct. at 766, 31 L.Ed.2d at 109; Martinez v. Wainwright, 621 F.2d at 186-88; Fuselier v. State, 468 So.2d 45, 56 (Miss. 1985). See also Box v. State, 437 So.2d 19, 25 n. 4 (Miss. 1983) (Robertson, J., specially concurring) (what information is *268 known or available to police officers is "deemed known by or available to the state").
The fact that Thomas admitted on cross-examination that he had not identified Smith to the police at the lineup, though he could have, does not alone make the error not grounds for a new trial; however, this in conjunction with the other overwhelming evidence of guilt does make us conclude that there is no reasonable likelihood that this false testimony affected the jury's judgment.

IS THERE NOW A SUFFICIENT SHOWING THAT THE IN-COURT IDENTIFICATIONS VIOLATED OUR HOLDING IN YORK V. STATE?
The records of the trial and the hearing also affirm what was said in the granting of the petition concerning the in-court identifications of Smith by Thomas and Wells being "perilously close to violating even the lenient guidelines of York [v. State, 413 So.2d 1372 (Miss. 1982)]." In Re Smith, 457 So.2d at 912. Both Thomas and Wells alleged in their affidavits that during the photograph lineup they picked Smith's picture because they were allowed to see the names on the backs of the photographs. Wells alleged that he was left alone with the pictures. It is now undisputed that the names were indeed on the backs of the five photographs used in the lineup.
At the hearing, the criminal investigator for the district attorney, who conducted the photograph lineup, denied allowing Thomas and Wells to see the back of the photographs, or that he left them alone in the room with the photographs. However, the trial record shows that Wells testified that he was left alone with the pictures and his testimony in this regard was pointed out to the jury in closing arguments to rebut the defense counsel's argument that Wells was pressured. Either Wells was telling the truth or the prosecuting attorney allowed him to testify falsely and then used such false testimony in his closing argument.
Arguably, the records show that the photograph lineup was "impermissibly suggestive". York v. State, 413 So.2d 1372, 1383 (Miss. 1982). However, we conclude that any error involving the in-court identification, which was a result of the pre-trial photograph lineup, was harmless beyond a reasonable doubt.

DID THE TRIAL COURT ERR BY NOT MAKING AVAILABLE THE TESTIMONY OF THOMAS AND WELLS?
Finally, Smith contends that it was error for the trial court not to grant his motion to make available the testimony of Thomas and Wells. Thomas and Wells both were called to testify at the hearing. The court, at the request of the state, admonished both that anything they said could be used against them and at any time they could confer with their lawyer. Both refused to testify.
Smith has cited no authority, nor have we found any, that requires or even authorizes a court in this state to grant immunity in exchange for testimony. We do see some good points in allowing a trial court, under the right circumstances, to grant use immunity to a witness who has exculpatory evidence which is essential to the defendant. See Autry v. Estelle, 706 F.2d 1394 (5th Cir.1983) (discusses the differing views on the issue as between the fifth and third circuits). However, the crux of these proceedings was whether Thomas and Wells had committed perjury. They needed to be sternly apprised of the fact that they were subjecting themselves to criminal charges. Otherwise, they could change their stories willy-nilly.
The judge liberally allowed the introduction of all the out of court statements made by Thomas and Wells. We find no showing of misconduct by the prosecution or the judge in unnecessarily intimidating Thomas and Wells into not testifying; therefore, there was no error in this regard. Autry v. Estelle, supra; United States v. Thevis, 665 F.2d 616 (5th Cir.1982); Knebel v. City of Biloxi, 453 So.2d 1037 (Miss. 1984).
*269 We conclude that the trial court did not abuse its discretion in denying Smith a new trial.[3]
AFFIRMED.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and HAWKINS, DAN M. LEE, PRATHER, ROBERTSON and ANDERSON, JJ., concur.
NOTES
[1] For a better understanding of the facts of this case, see the opinion affirming the conviction on direct appeal, Smith v. State, 419 So.2d 563 (Miss. 1982).
[2] The allegation that the officer did not have a constitutional basis for this initial stop was not proven. See Lanier v. State, 450 So.2d 69, 73-74 (Miss. 1984).
[3] The trial court determined the issue which was presented to it by this Court when we granted Smith authority to file his petition for writ of error coram nobis. The issue concerning nondisclosure of exculpatory information was not presented. The issue is now before this Court in Smith's new post-conviction petition filed pursuant to the "Mississippi Uniform Post-Conviction Relief Act".